James CURRY, Appellant,

v.

Jesse BROWN, Secretary of Veterans
Affairs, Appellee.

No. 91–504.

United States Court of Veterans Appeals.

Oct. 5, 1994.

James Curry, pro se.

Mary Lou Keener, Gen. Counsel, Norman G. Cooper, Asst. Gen. Counsel, Adrienne Koerber, Deputy Asst. Gen. Counsel, and Barbara J. Finsness, Washington, DC, were on the pleadings for the appellee.

Before NEBEKER, Chief Judge, and FARLEY and STEINBERG, Judges.

STEINBERG, Judge:

The pro se appellant, World War II veteran James Curry, appeals a July 19, 1993, decision of the Board of Veterans' Appeals (BVA or Board) denying entitlement to service connection for chronic obstructive pulmonary disease (COPD). Supplemental (Suppl.) Record (R.) at 3–10. (The appellant is also referred to in the record on appeal (ROA) as "James Currey". *See, e.g.,* R. at 1, 6, 9.) The appellant has filed an informal brief. The Secretary has filed a motion for summary affirmance in lieu of a brief. Because the Court finds that the outcome is "reasonably debatable", *see Frankel v. Derwinski,* 1 Vet.App. 23, 25–26 (1990), the case is not appropriate for summary disposition. For the reasons that follow, the Court will affirm the Board's decision.

## I. Background

The veteran served on active duty in the U.S. Army from July 1942 to December 1945. R. at 1. Except for the report of a September 1943 "Physical Examination for Flying", which recorded no relevant disabilities (R. at 39–40), his service medical records (SMRs) are missing and presumed destroyed. *See* R. at 17–18. Between June and August 1974, he was hospitalized three times at the Shreveport, Louisiana, Veterans' Administration (now Department of Veterans Affairs) (VA) medical center (MC), at which time a history of "shortness of breath since 1946" and a discharge diagnosis of chronic obstructive lung disease were recorded. R. at 3–5, 96–100. In August 1974, the veteran filed with a VA regional office (RO) an application for compensation or pension, describing the claimed disability as follows: "Chok[ ]ing in lower neck & upper chest—1950[.] Emphysema. Diagnosed as same as above but worse now." R. at 7. In decisions dated September and December 1974, the RO denied entitlement to non-service-connected pension; those decisions did not address the issue of service connection. R. at 10–12.

In June 1975, the veteran submitted to the RO a medical record from the Travis Clinic Association, a private institution, detailing treatment between July 1947 and September 1956. R. at 13–14. A May 1955 entry contains the earliest reference to "esophageal spasm", and a September 1956 entry stated as follows:

> Recurrent episodes of a choking sensation. The onset of this illness was about 3 months ago when he first began to notice a feeling of choking and a lump in his throat.

These were rather disturbing sensations[,] often awakening him in the night. Since then he has had pain through his chest, increased severity of the choking sensation. He has been examined by several physicians all of whom gave the opinion that it was nervousness.

R. at 13. Later in June 1975, the RO informed the veteran that his SMRs could not be located, listed several types of evidence that would support his claim, and requested that he submit any such evidence. R. at 15. The veteran then submitted statements from two of his sisters (both nurses) (R. at 22–23, 28–29, 31–33) and three friends (R. at 25–27) stating that he had been in good health prior to service but upon discharge had suffered from a choking sensation and breathing problems. In February 1976, the RO denied service connection for nervousness. R. at 19.

Subsequently, the RO received medical records, dated December 1976, made by W.D. Thames, M.D., a private physician. R. at 35–38. Those records stated, inter alia: "Longstanding case of [COPD] and [asthma]." R. at 35. In an October 1977 letter to the RO, the veteran's wife stated that he had been in good health before service, but after receiving flu shots prior to separation he had experienced "choking in the lower neck". R. at 43. She further stated that a doctor at the San Antonio, Texas, Army separation center had opined that the choking had been caused by the shots and had advised the veteran to never take another flu shot. *Ibid.* She stated that in February 1946 the veteran sought treatment from Dr. J.M. Travis, who prescribed medication to relieve choking; however, she asserted, no records of that treatment exist. *Ibid.* She further asserted that her husband subsequently sought treatment at the Shreveport VAMC and that in 1956 he sought treatment from a Dr. George Hilliard after the choking moved from the lower throat into the chest. *Ibid.* In an August 1978 decision, the Board found that chronic obstructive lung disease had not been shown to be present until many years after service and denied service connection. R. at 45–48.

A September 1978 statement from the Travis Clinic stated: "It is possible that [the veteran] was seen in the Travis Clinic prior to 1947 and no notation made in the record to that effect. No record is available and we have no way of knowing." Second (Sec.) Suppl. R. at 4. In February 1979, the RO received an October 1978 statement from Dr. Thames that the veteran "has been treated for [COPD] since 1963" (R. at 49), and a January 1979 statement from L.L. Travis, M.D., a private physician, that the veteran had been seen by that physician's father, J.M. Travis, M.D., for "respiratory trouble" on three occasions in January and February 1946. R. at 53.

In August 1979, the RO received the following statement, dated that same month, from Dr. L.L. Travis:

This is a follow-up of the previous letter dated January 25, 1979, stating that [the veteran] was seen by Dr. J.M. Travis, Sr.[,] in January and February 1946. The progressive obstructive lung disease that [the veteran] suffers from today, is the same condition he was treated for on those dates and can only be treated, not cured.

R. at 74. Also in August 1979, the veteran and his wife testified under oath at a hearing held at the RO. R. at 76–83. He stated that in December 1945, while at Fort Sam Houston in San Antonio, he had suffered from choking and coughing and that in January 1946 he had sought treatment from Dr. J.M. Travis (R. at 76–77); that Dr. Travis had treated the condition as asthma and referred him to Dr. Hilliard, who in turn had referred him to the Shreveport VAMC in 1950; that he was also referred to a Dr. Lewis and a Dr. Abbington (R. at 78); and that records made by Drs. J.M. Travis, Lewis, and Hilliard had either been destroyed or misplaced. R. at 82. In October 1979, the RO again denied service connection for a lung disability. R. at 84. After an appeal to the Board, it concluded, in an April 1980 decision, that the August 1978 Board decision did not contain obvious error and that the evidence received subsequent to that decision did not constitute a "new factual basis" for an award of service connection. The BVA, therefore, denied entitlement to service connection for chronic obstructive lung disease. R. at 89.

The ROA contains an August 1980 letter to the RO from Daniel Jenkins, M.D., professor of medicine at Baylor College of Medicine, who stated that he had examined the veteran in June 1970 and June 1980 and further stated:

It is quite evident from the history and examination and from the pulmonary function studies ... that [the veteran] suffers from chronic bronchitis with marked obstructive features and from co-existing pulmonary emphysema....

From the history given by [the veteran] it appears evident that symptoms of breathing difficulty began prior to his seperation [sic] from the [Army] Air Force[s] in December of 1945. The physician, Dr. J.N. [sic] Travis, who saw him following his discharge made a diagnosis of chronic obstructive airway disease....

In my opinion, the evidence clearly points to a service[-]connected disability.

R. at 93. Although the letter stated that Dr. Jenkins was enclosing copies of the June 1970 and June 1980 examination reports, no such reports accompany this letter in the ROA.

The ROA also contains duplicates of the 1974 Shreveport VAMC hospitalization summaries as well as summaries, dated 1975, similarly indicating admission for and treatment of chronic obstructive lung disease. R. at 96–100.

In January 1989, the veteran requested reopening of his claim, submitting to the RO a January 1989 statement by Dr. Thames stating that he had treated the veteran since 1963 for obstructive pulmonary disease and that the disease process was "already fairly advanced" in 1963. R. at 111. In February 1989, the RO denied service connection for COPD. R. at 112. In March 1989, the veteran filed a Notice of Disagreement (NOD) (R. at 115) and in January 1990 filed a statement asserting that service connection should be awarded because Dr. L.L. Travis' August 1979 statement constituted proof that the veteran had incurred COPD in service. Sec. Suppl.R. at 1–2. In a January 1991 decision, the Board denied entitlement to service connection for COPD. *James Currey*

[sic], BVA 91––––– (Jan. 25, 1991). A timely appeal to this Court followed.

On appeal to the Court, the Secretary filed a motion for remand, confessing as error the Board's failure to follow correctly the two-step analysis set forth in *Manio v. Derwinski*, 1 Vet.App. 140, 145 (1991), and the benefit-of-the doubt rule under 38 U.S.C. § 5107(b). By single-judge order dated February 21, 1992, the Court granted the Secretary's motion and remanded the matter to the Board for further development and readjudication. *Curry v. Derwinski*, 2 Vet.App. 213 (1992) (single-judge order).

In a July 1992 decision, the Board remanded the matter to the RO with instructions to undertake the following actions:

1. Request from the Shreveport VAMC outpatient and hospital treatment records pertaining to the veteran prior to 1974;

2. Contact Dr. Jenkins so as to obtain a copy of his June 1970 and June 1980 examination records;

3. Contact Dr. W.D. Thames so as to obtain copies of his treatment records pertaining to the veteran, particularly records of his 1963 initial treatment of the veteran;

4. Contact Travis Clinic Association so as to obtain any records, dated 1947, pertaining to the veteran, particularly the report of an examination referred to in a July 5, 1947, entry in clinic records;

5. Contact Memorial Medical Center of East Texas so as to obtain copies of all hospitalization/discharge summaries relating to the veteran dated prior to 1977; and

6. Contact Dr. L.L. Travis so as to obtain a statement as to whether, in formulating his 1979 statements, he had referred to treatment records or his own recollection.

Suppl.R. at 21–22.

In November 1992, the RO attempted to contact those individuals and institutions. *See* Suppl.R. at 29, 31, 33, 35, 37, 39. The RO's letter to the Travis Clinic was returned undelivered, and the RO thereupon requested the veteran to contact that clinic himself to seek to obtain any relevant records. Suppl.R. at 40, 42. In November 1992, the RO received records of Dr. L.L. Travis

(Suppl. R. at 64–72), dated October and November 1989, noting findings of, inter alia, hyperinflation of the lungs and emphysema. Suppl.R. at 66–67. In an October 1989 progress note, Dr. Travis wrote: "[The veteran] has a rather strange story. He says he smoked cigarettes for a while during the War, and he pretty much quit in 1946 when he got out of the Army. Nevertheless, he has been diagnosed as having severe COPD and has shortness of breath." Suppl.R. at 68.

In December 1992, the RO received records from the Memorial Medical Clinic of East Texas. Suppl.R. at 45–60. Those records, dated April 1986 through November 1987, contain diagnoses of chronic obstructive lung disease but are silent as to the etiology of that condition. *See ibid.* In a December 1992 letter to the veteran, the RO stated that it could not obtain records from Dr. Thames and requested the veteran to contact that physician. Suppl.R. at 78. Later that month, the veteran informed the RO that the Travis Clinic no longer existed and that its medical records had been destroyed. Suppl.R. at 80.

Also in December 1992, the RO received medical records from Dr. Jenkins. Suppl.R. at 83–96. According to a June 1980 history and examination report, the veteran stated that he had been well until late 1945, when he received vaccinations; the report stated that, "from his medical records" he had received cholera and typhus vaccine in September 1945 and typhoid, yellow fever, and plague vaccine in October 1945. Suppl.R. at 84. Further, according to the report, following the October 1945 vaccinations the veteran had reported to sick bay with symptoms of pain in his throat and neck and difficulty breathing and was given medications. *Ibid.* In December 1945 or January 1946, he saw Dr. J.M. Travis, who had diagnosed asthma and obstructive airway disease. *Ibid.* The report stated that in 1946 he had been given oxygen to use at home when necessary for shortness of breath and that over the subsequent ten years the amount of work he could do was limited by shortness of breath and wheezing. *Ibid.* Dr. Jenkins stated diagnostic impressions of, inter alia, "Severe

COPD with components of emphysema and chronic bronchitis" and "Asthma, by history". Suppl.R. at 86–87. Dr. Jenkins submitted copies of June 1980 clinical test results; the "summary and clinical correlation" stated that the results were "compatible with marked obstructive chronic pulmonary disease" but did not opine as to a date of onset. *See* Suppl.R. at 91. Dr. Jenkins also submitted a copy of his August 1980 letter to the RO, in which he had stated that he was enclosing copies of his June 1970 and June 1980 examination reports; however, no June 1970 report appears in the ROA.

In February 1993, the RO received duplicate copies of the 1974–75 Shreveport VAMC hospitalization summaries (showing the veteran's admission for and treatment of COPD), accompanied by a cover memorandum indicating that these copies constituted the "complete record at this facility". Suppl.R. at 116–21.

In a January 1993 letter to the RO, the veteran stated that Dr. Thames had retired and that the Thames Clinic had been closed for many years. He wrote:

> Unfortunately further medical records do not exist. In any event those records were all aquired [sic] many years ago. It is unfortunate that more records do not exist in any of these places. I have exhausted all efforts to aquire [sic] all of the records that existed in all of the places that are or were mentioned to me by [VA] in the past.

Suppl.R. at 104.

In February 1993, the RO again denied service connection, concluding that "the medical information that we received in reply to the [Court's] remand of your claim does not constitute new and material evidence". Suppl.R. at 107. In a March 1993 letter to the RO, the veteran asserted that "[t]he lack of proper medical records from places like the [VA] Clinic in Shreveport ... and others is the reason my case is not being given any consideration", and requested consideration of "the records along with all that is in my case file". Suppl.R. at 131. According to an April 1993 RO "Report of Contact", the veteran did not have any additional information. The form stated: "Please send his claim to BVA as soon as possible". Suppl.R. at 133.

In an April 1993 written presentation to the BVA, the veteran's representative argued that the preponderance of the evidence was in the veteran's favor and urged the Board to award service connection. Suppl.R. at 142.

In the July 19, 1993, decision here on appeal, the Board determined that the claim was well grounded and that new and material evidence, in the form of private physician statements opining that the veteran's COPD had begun in service, had been presented. Suppl.R. at 6–7. The Board noted that, although the RO had determined that new and material evidence had not been presented, "we do not believe the veteran has been prejudiced in any way in the presentation of his claim by this determination." Suppl.R. at 7. The Board stated as follows:

It is clear from the veteran's substantive appeal that he disagrees with the RO's determination that the additional evidence was not new and material, but he has also presented contentions and arguments regarding the merits of his claim. In particular, there is a January 1990 statement which succinctly presents the veteran's position, and we would also note that his representative has also argued the merits of the veteran's claim in presentations before the VA. The veteran has been provided with adequate notice of the need to submit evidence, and indeed has assisted in attempting to obtain that evidence, but he has come to the conclusion that no further relevant evidence exists. As for the veteran's argument or the premise of his claim, he simply contends that his COPD began during service and was treated shortly thereafter. This argument has been consistently presented since the veteran first filed a claim which led to the Board's August 1978 decision. We therefore find that the RO's incorrect determination that the additional evidence associated with the claims file since the Board's last decision was not new and material amounted to "harmless error" and that the veteran will not be prejudiced by moving on to the next question, a review of the merits of the claim based on all of the evidence of record.

Suppl.R. at 7.

As to the merits of the claim, the Board noted that SMRs were presumed destroyed by fire and that the "most contemporaneously dated" medical evidence consisted of the single-page record from the Travis Clinic detailing treatment between July 1947 and September 1956. Suppl.R. at 8. The Board noted that this record made no reference to COPD, emphysema, or respiratory complaints, but referred to recurrent episodes of choking sensation. Because SMRs were missing, the Board stated:

[T]his case essentially turns on the credibility and probative value of the veteran's statements made to treating physicians and his testimony. This is so because the one physician who offered an opinion that the veteran's pulmonary disability began during service, Daniel E. Jenkins, M.D., relies heavily, if not exclusively, on the history provided by the veteran, a history which we find is inaccurate and inconsistent with the record before us.

Suppl.R. at 9. The Board stated that "the more contemporaneous the evidence, the greater [the] probative value and credibility that can be attached to that evidence, especially when later-dated testimony[ ] and statements were generated for pecuniary purposes", and quoted from McCormick on Evidence (3rd ed. 1984) to the effect that, because "memory hinges on recency", earlier statements are generally more trustworthy than later ones. Suppl.R. at 9. The Board concluded: "We believe that the history reported by the veteran in 1974, when viewed in connection with the most contemporaneous medical evidence of record, leads to a reasonable conclusion that the veteran's pulmonary disorder began years after his separation". *Ibid.*

The Board addressed the lay statements of record and concluded that, under *Espiritu v. Derwinski,* 2 Vet.App. 492, 494 (1992) (lay witness not competent to offer opinion requiring medical knowledge), they did not demonstrate the presence of COPD shortly after service. Suppl.R. at 10. The Board stated that the 1979 statements of the junior Dr. Travis were not substantiated by the contemporaneous Travis Clinic records, which showed that the veteran had first been

seen in 1947 and that the first complaint remotely resembling a respiratory complaint had been made in 1956. The Board acknowledged that a September 1978 statement from the Travis Clinic Association indicated the possibility that the veteran had been seen prior to 1947 and that no notation was then made in the records, but the Board concluded that "such a possibility must be discounted given the detailed nature of even routine entries shown on the Travis Clinic Association record" in the claims file. Suppl.R. at 10. The Board found it "unlikely that the veteran was seen for a chronic, as opposed to an acute, complaint, given the absence of pertinent complaints between 1947 and 1956". *Ibid.*

The Board found that the January 1989 statement from Dr. Thames indicated only that the veteran had been treated for COPD since 1963 and was thus consistent with a 1950s onset of COPD. The Board described the "most supportive medical evidence" as coming from Dr. Jenkins, but stated that the Jenkins evidence was "based on a history related by the veteran which is inconsistent with the history he reported in 1974 and is not substantiated by the medical evidence of record". *Ibid.* Inter alia, the Board noted that Dr. Jenkins' June 1980 examination report had stated that the veteran had been given oxygen in 1946 and oxygen therapy during his 1974 Shreveport VAMC hospitalization, but that the Shreveport hospitalization records did not indicate oxygen therapy. *Ibid.* The Board concluded that COPD had its onset several years after service, that the preponderance of the evidence was against the claim, and that there was no benefit of the doubt that could be resolved in the veteran's favor. The BVA therefore denied the claim. Suppl.R. at 11. A timely appeal to this Court followed.

## II. Analysis

### A. *Law on Reopening*

■ Pursuant to 38 U.S.C. § 5108, the Secretary must reopen a previously and finally disallowed claim when "new and material evidence" is presented or secured with respect to that claim. *See* 38 U.S.C. § 7104(b); *Suttmann v. Brown*, 5 Vet.App. 127, 135 (1993). On claims to reopen previously and finally disallowed claims, the BVA must conduct a "two-step" analysis. *Manio*, 1 Vet.App. at 145. First, it must determine whether the evidence presented or secured since the prior final disallowance of the claim is "new and material". If it is, the Board must then review the new evidence "in the context of" the old to determine whether the prior disposition of the claim should be altered. *Jones (McArthur) v. Derwinski*, 1 Vet.App. 210, 215 (1991). The determination as to whether evidence is "new and material" is a question of law subject to de novo review by this Court under 38 U.S.C. § 7261(a)(1). *See Masors v. Derwinski*, 2 Vet.App. 181, 185 (1992); *Jones*, 1 Vet.App. at 213; *Colvin v. Derwinski*, 1 Vet.App. 171, 174 (1991).

The Court has synthesized the applicable law as follows:

> "New" evidence is that which is not merely cumulative of other evidence of record. "Material" evidence is that which is relevant to and probative of the issue at hand and which, as this Court stated in *Colvin, supra,* . . . must be of sufficient weight or significance (assuming its credibility) that there is a reasonable possibility that the new evidence, when viewed in the context of all the evidence, both new and old, would change the outcome.

*Cox v. Brown*, 5 Vet.App. 95, 98 (1993); *see also Justus v. Principi*, 3 Vet.App. 510, 513 (1992) (in determining whether the evidence is new and material, "the credibility of the evidence is to be presumed").

In the instant case, the evidence submitted since the April 1980 BVA decision consists of the following items: (1) the Shreveport VAMC hospital summaries dated 1974 and 1985 (R. at 96–100); (2) Dr. Jenkins' 1980 medical records (Suppl.R. at 83–96) and letter opining that "the evidence clearly points to a service[-]connected disability" (R. at 93); (3) the Memorial Medical Clinic treatment records dated 1986–87 (Suppl.R. at 45–60); (4) Dr. Thames' 1989 statement (R. at 111); and (5) Dr. Travis' 1989 treatment records (Suppl.R. at 66–67).

■ In item 2, Dr. Jenkins stated his opinion, based not merely on the veteran's own recitation of events but also on his review of

unspecified "medical records" and his own examination of the veteran (Suppl.R. at 84), that the veteran's breathing difficulty had begun in service and his belief that "the evidence clearly points to a service[-]connected disability". R. at 93. Item 2 is "new" because it is not cumulative of other evidence of record, and it is "material" because, presuming its credibility, *see Cox, supra; Justus, supra,* it is "relevant to and probative of the issue at hand" and creates "a reasonable possibility that the new evidence, when viewed in the context of all the evidence, both new and old, would change the outcome". *Cox, supra; cf. Reonal v. Brown,* 5 Vet.App. 458, 460 (1993) (medical opinion has no probative value, and is thus not "material", when based on a version of events provided by the veteran which had been previously rejected in prior final RO or Board decision). Having found new and material evidence, the Court need not discuss the other three items of evidence. Accordingly, the Court holds, as a matter of law, that new and material evidence was presented and thus reopening of the claim was required.

### B. Bernard v. Brown Prejudice Standard

In *Bernard v. Brown,* the Court held that when the Board

> addresses in its decision a question that had not been addressed by the RO, it must consider whether the claimant has been given adequate notice of the need to submit evidence or argument on that question and an opportunity to submit such evidence and argument and to address that question at a hearing, and, if not, whether the claimant has been prejudiced thereby.

*Bernard v. Brown,* 4 Vet.App. 384, 394 (1993). In the instant case, the February 1989 and February 1993 RO decisions leading to the BVA decision here on appeal had each determined that new and material evidence had not been presented and thus the RO had never addressed the merits of the appellant's claim. *See* R. at 112; Suppl.R. at 107. The Board, therefore, correctly proceeded to inquire whether its addressing the merits of the claim would, under *Bernard,* prejudice the appellant.

■ This case presents the Court with a question of first impression: What is the appropriate standard for this Court to use in reviewing a Board determination under *Bernard* that an appellant would not be prejudiced by the Board's deciding an issue which was not first decided by the RO? We hold that the existence of prejudice is a question of law subject to de novo review by this Court under 38 U.S.C. § 7261(a)(1). *See Miller v. Fenton,* 474 U.S. 104, 113–14, 106 S.Ct. 445, 451–52, 88 L.Ed.2d 405 (1985) ("the decision to label an issue a 'question of law,' a 'question of fact,' or a 'mixed question of law and fact' is sometimes as much a matter of allocation as it is of analysis"); *cf. Masors, supra* (whether new and material evidence has been presented is question of law subject to de novo review); *Colvin, supra* (same); *Grottveit v. Brown,* 5 Vet.App. 91, 92 (1993) (whether claim is well grounded is question of law); *Bagby v. Derwinski,* 1 Vet.App. 225, 227 (1991) (whether Board correctly applied presumption of aggravation is question of law); *see also Butts v. Brown,* 5 Vet.App. 532, 541–49 (1993) (Steinberg, J., concurring) (discussing standards of judicial review for various BVA determinations). As the Supreme Court has stated:

> At least in those instances in which Congress has not spoken and in which the issue falls somewhere between a pristine legal standard and a simple historical fact, the fact/law distinction at times has turned upon a determination that, as a matter of the sound administration of justice, one judicial actor is better suited than another to decide the issue in question.

*Miller,* 474 U.S. at 114, 106 S.Ct. at 451. Here, we find that the Court is the better suited.

■ For the following reasons, the Court holds, as a matter of law, that the appellant was not prejudiced under *Bernard* by the Board's addressing the merits of the claim. As noted by the Board, (1) the veteran's January 1990 submission to the RO (Sec. Suppl.R. at 1–2) asserted that service connection should be awarded because Dr. L.L. Travis' August 1979 statement (which had been before the Board at the time of its prior final merits decision in April 1980 and thus

could not be "new and material" evidence, *see Cox, supra* ) constituted proof that the veteran had incurred COPD in service, thus arguing the merits of the claim; (2) he had been provided with notice of the need to submit evidence in support of his service-connection claim (Suppl.R. at 42, 78), had assisted in attempting to obtain that evidence (Suppl.R. at 80, 104), and had indicated his belief that no further relevant evidence existed (Suppl.R. at 104, 133); and (3) since 1975, he has consistently presented the same argument in support of his claim of entitlement to service connection—namely, that his COPD began in service and was treated shortly after discharge. *See* R. at 22–23, 43, 76–83; Suppl.R. at 131; Sec. Suppl.R. at 1–2. We also note that the appellant has made merits-based arguments throughout the course of the administrative adjudication process and did not at any point (either before the Board, by way of a motion for reconsideration, or before this Court) claim that he had been prejudiced by the Board's adjudicating on the merits without having first remanded the matter to the RO.

The Court takes this opportunity to note that, in light of the fair-process and notice concerns that animated this Court's holdings in two recent cases, the better practice in the future would be for the Board, before undertaking a merits adjudication without first remanding the matter to the RO, to ask if the claimant objects to such Board adjudication in the first instance, and, if so, to specify how such BVA adjudication would be prejudicial to his or her interests. *See Austin v. Brown,* 6 Vet.App. 547, 551 (1994) (BVA decision must be set aside where, at least in part, "it rests upon a medical opinion procured by a process which violates both the express holding of *Thurber [v. Brown, infra],* and the fair process principle underlying *Thurber* "); *Thurber v. Brown,* 5 Vet.App. 119, 126 (1993) (before BVA relies on any evidence developed or obtained by it subsequent to the issuance of most recent Statement of the Case (SOC) or Supplemental SOC, BVA must provide claimant with reasonable notice of such evidence and of reliance proposed to be placed on it and reasonable opportunity for claimant to respond to it). Such a procedure would en-

sure that the Board decision avoids the error cautioned against in *Bernard, supra.*

### C. Merits of Reopened Claim

In light of our holdings, in parts II.A. and II.B., *supra,* that the appellant submitted new and material evidence so as to reopen his claim and that he suffered no prejudice from the Board's addressing the merits of his claim, we turn now to the merits of the reopened claim.

The Court reviews BVA factfinding under a "clearly erroneous" standard; "if there is a 'plausible' basis in the record for the factual determinations of the BVA, ... we cannot overturn them". *Gilbert v. Derwinski,* 1 Vet.App. 49, 53 (1990); 38 U.S.C. § 7261(a)(4). The Board is required to provide an adequate written statement of the reasons or bases for its findings and conclusions on all material issues of fact and law presented on the record; the statement must be adequate to enable a claimant to understand the precise basis for the Board's decision, as well as to facilitate review in this Court. *See* 38 U.S.C. § 7104(d)(1); *Simon v. Derwinski,* 2 Vet.App. 621, 622 (1992); *Masors,* 2 Vet.App. at 188; *Gilbert,* 1 Vet.App. at 57. When an appellant's service records are missing, as the record shows that most of the veteran's are, "the BVA's obligation to explain its findings and conclusions and to consider carefully the benefit-of-the-doubt rule is heightened." *Moore (Howard) v. Derwinski,* 1 Vet.App. 401, 406 (1991); *see also O'Hare v. Derwinski,* 1 Vet.App. 365, 367 (1991).

Based on a review of the evidence, the Court holds that a plausible basis exists in the record for the Board's findings that (1) "the most contemporaneous evidence of record shows that the veteran's COPD was not manifested prior to 1950" and (2) "[p]hysicians' opinions that the veteran's COPD had its onset during service were based on an inaccurate history provided by the veteran". Suppl.R. at 5. The first contemporaneous medical record of a chest-area complaint was the 1955 Travis Clinic notation of "esophageal spasm" (R. at 13)—almost 10 years after discharge—and the first contemporaneous di-

agnosis of a pulmonary disorder was Dr. Thames' 1975 diagnoses of acute respiratory distress and COPD (R. at 56, 63). Although Dr. Thames had stated in October 1978 that he had treated the veteran for "fairly advanced" COPD starting in 1963—18 years after the veteran's discharge—no contemporaneous records of such treatment appear in the ROA.

Similarly, the Court holds that a plausible basis also exists in the record for the Board's second finding of fact. Although Dr. L.L. Travis in August 1979 stated that the veteran was then suffering from the same "progressive obstructive lung disease" for which Dr. J.M. Travis, Sr., had treated the veteran in 1946, the Board correctly noted that no record of such treatment exists and that the Travis Clinic record detailing treatment from 1947 to 1956 contained no mention of COPD or any respiratory complaints. Suppl.R. at 8; see R. at 74.

With respect to Dr. Jenkins' August 1980 letter stating that "[f]rom the history given by [the veteran] it appears evident that symptoms of breathing difficulty began ... in December of 1945", that "Dr. J. [M.] Travis ... saw him following his discharge [and] made a diagnosis of chronic obstructive airway disease", and that "the evidence clearly points to a service[-]connected disability", R. at 93, the Board expressed its belief that Dr. Jenkins "relie[d] heavily, if not exclusively, on the history provided by the veteran". Suppl.R. at 9. Although Dr. Jenkins apparently reviewed records indicating in-service vaccinations (see Suppl.R. at 84), the Board noted that Dr. Jenkins' recitation of a post-service diagnosis by the senior Dr. Travis was not supported by Travis Clinic records and that Dr. Jenkins' recitation of December 1945 breathing-difficulty symptoms was not confirmed by contemporary objective medical evidence. The BVA thus concluded that Dr. Jenkins' opinion as to service connection was based on the veteran's own version of events. In turn, the Board determined that the veteran's version of events was "inaccurate" and "inconsistent with the record", and therefore of limited credibility and probative value. Suppl.R. at 9.

Among the Board's stated reasons or bases for its credibility determination are that the veteran's August 1974 claim form did not mention any in-service symptomatology of COPD or a pulmonary disorder and did not mention any treatment shortly after service but instead described his disability and its date of onset as "[c]hok[ ]ing in lower neck & upper chest—1950[.] Emphysema" (R. at 7). The Board noted that the veteran's 1974 version of events was consistent with the 1956 Travis Clinic record but was inconsistent with his current version of events—namely, his assertion of in-service pulmonary symptomatology and 1946 treatment by Dr. Travis for a pulmonary condition. The Board determined that the veteran's earlier version of events was credible because it was supported by contemporaneous medical evidence and it had been made closer in time to the events at issue. The Court holds that there is thus a plausible basis in the record for the Board's finding that Dr. Jenkins' statement was of limited probative value because it was based primarily upon the veteran's discredited assertion of in-service pulmonary symptomatology and treatment for a pulmonary complaint within one year after service.

### III. Conclusion

Upon consideration of the record and the pleadings of the parties, the Court holds that the appellant has not demonstrated that the BVA committed error—in its findings of fact, conclusions of law, procedural processes, consideration of the benefit-of-the-doubt rule, or articulation of reasons or bases—that would warrant remand or reversal under 38 U.S.C. §§ 5107(a), (b), 5108, 7104(b), (d)(1), 7252, and 7261 and the analysis in *Gilbert, supra.* The Court affirms the July 19, 1993, BVA decision.

AFFIRMED.