http://www.va.gov/vetapp16/Files6/1644948.txt

Citation Nr: 1644948 
Decision Date: 11/30/16 Archive Date: 12/09/16

DOCKET NO. 12-13 100 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Lincoln, Nebraska

THE ISSUES

1. Entitlement to service connection for diabetes mellitus, to include as due to herbicide exposure. 

2. Entitlement to service connection for ischemic heart disease, to include as due to herbicide exposure. 

3. Entitlement to service connection for peripheral neuropathy of the lower extremities, to include as due to herbicide exposure and as secondary to diabetes mellitus. 

4. Entitlement to service connection for erectile dysfunction, to include as secondary to diabetes mellitus. 

REPRESENTATION

Veteran represented by: The American Legion

WITNESS AT HEARING ON APPEAL

The Veteran

ATTORNEY FOR THE BOARD

Avery M. Schonland, Associate Counsel

INTRODUCTION

The Veteran had active service from September 1965 to September 1970. 

This matter comes before the Board of Veterans' Appeals (Board) on appeal from a July 2011 rating decision by the Department of Veterans Affairs (VA) Regional Office (RO) in Lincoln, Nebraska. 

In May 2013, the Veteran testified at a videoconference hearing before a Veterans Law Judge. A transcript of that hearing is of record. The Veterans Law Judge who conducted this hearing has since retired. The Veteran was notified that the Veterans Law Judge was no longer available to decide his case and offered him the opportunity to testify at another hearing; however, in March 2014, he responded that he did not want an additional hearing. 

The Board remanded the case for further development June 2014. That development was completed, and the case since returned to the Board. 

This appeal was processed using Virtual VA and the Veterans Benefits Management System (VBMS) paperless claims processing system. Accordingly, any future consideration of this Veteran's case should take into consideration the existence of this electronic record. 

FINDINGS OF FACT

1. The Veteran did not serve in the Republic of Vietnam during the Vietnam era and was not otherwise exposed to herbicides during his military service. 

2. Diabetes mellitus did not manifest in service or to a compensable degree within one year of separation and is not otherwise related to the Veteran's military service.

3. Ischemic heart disease did not manifest in service or to a compensable degree within one year of separation and is not otherwise related to the Veteran's military service.

4. Peripheral neuropathy of the lower extremities did not manifest in service and is not otherwise related to his military service or to a service-connected disability. 

5. Erectile dysfunction did not manifest in service and is not otherwise related to his military service or to a service-connected disability. 

CONCLUSIONS OF LAW

1. Diabetes mellitus was not incurred in active service and may not be presumed to have been so incurred. 38 USCA §§ 1110, 1112, 1113, 1116, 1154 (West 2014); 38 C F R §§ 3.102, 3.159, 3.303, 3.307, 3.309 (2015).

2. Ischemic heart disease was not incurred in active service and may not be presumed to have been so incurred. 38 USCA §§ 1110, 1112, 1113, 1116, 1154 (West 2014); 38 C F R §§ 3.102, 3.159, 3.303, 3.307, 3.309 (2015).

3. Peripheral neuropathy of the lower extremities was not incurred in active service, may not be presumed to have been so incurred, and is not proximately due to, the result of, or aggravated by a service-connected disability and may not be presumed to have been so incurred. 38 USCA §§ 1110, 1112, 1113, 1116, 1154 (West 2014); 38 C F R §§ 3.102, 3.159, 3.303, 3.307, 3.309, 3.310 (2015).

4. Erectile dysfunction was not incurred in active service and is not proximately due to, the result of, or aggravated by a service-connected disability. 38 USCA §§ 1110, 1154 (West 2014) 38 C F R §§ 3.102, 3.159, 3.303, 3.310 (2015).

REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

Upon receipt of a substantially complete application for benefits, VA must notify the claimant of what information or evidence is needed in order to substantiate the claim and it must assist the claimant by making reasonable efforts to get the evidence needed. 38 U.S.C.A. §§ 5103(a), 5103A; 38 C.F.R. § 3.159(b); see Quartuccio v. Principi, 16 Vet. App. 183, 187 (2002). The notice required must be provided to the claimant before the initial unfavorable decision on a claim for VA benefits, and it must (1) inform the claimant about the information and evidence not of record that is necessary to substantiate the claim; (2) inform the claimant about the information and evidence that VA will seek to provide; and (3) inform the claimant about the information and evidence the claimant is expected to provide. 38 U.S.C.A. § 5103(a); 38 C.F.R. § 3.159(b)(1); Pelegrini v. Principi, 18 Vet. App. 112, 120 (2004). 

Upon receipt of an application for a service-connection claim, 38 U.S.C. § 5103(a) and 38 C.F.R. § 3.159(b) require VA to review the information and the evidence presented with the claim and to provide the claimant with notice of what information and evidence not previously provided, if any, will assist in substantiating, or is necessary to substantiate, each of the five elements of the claim, including notice of what is required to establish service connection and that a disability rating and an effective date for the award of benefits will be assigned if service connection is awarded. Dingess v. Nicholson, 19 Vet. App. 473 (2006). 

In this case, the RO provided the Veteran with notice letters in February 2011 and March 2011, prior to the initial adjudication of the claims in July 2011. Therefore, the timing requirement of the notice as set forth in Pelegrini has been met and to decide the appeal would not be prejudicial to the claimant. 
The requirements with respect to the content of the notice were also met in this case. The RO informed the Veteran in the February 2011 notice letter about the information and evidence that is necessary substantiate his claims for service connection and of the division of responsibilities in obtaining such evidence. The February 2011 letter also explained how disability ratings and effective dates are determined. The March 2011 letter further explained the information and evidence needed to substantiate his claims for service connection on a secondary basis. Thus, the duty to notify has been met.

In addition, the duty to assist the Veteran has been satisfied in this case. The Veteran's service treatment records, service personnel records, and all identified and available post-service medical records have been obtained and were reviewed by both the RO and the Board in connection with the Veteran's claims. He has not identified any available, outstanding evidence that is pertinent to the claims being decided herein.

The Board does acknowledge that the Veteran has not been afforded VA examinations in connection with his claim. In the case of McLendon v. Nicholson, 20 Vet. App. 79 (2006), the United States Court of Appeals for Veterans Claims (Court) held that an examination is required when (1) there is evidence of a current disability, (2) evidence establishing an "in-service event, injury or disease," or a disease manifested in accordance with presumptive service connection regulations occurred which would support incurrence or aggravation, (3) an indication that the current disability may be related to the in-service event, and (4) insufficient evidence to decide the case. 

In this case, VA examinations are unnecessary to decide the claims for service connection for diabetes mellitus, ischemic heart disease, peripheral neuropathy, and erectile dysfunction. As discussed below, the Veteran has not been shown to have an injury, disease, or event in service, including herbicide exposure. Moreover, as the claim for service connection for diabetes mellitus is denied, the claims for service connection for peripheral neuropathy of the lower extremities and erectile dysfunction cannot be granted on a secondary basis. As such, a VA examination would not provide any more pertinent information than is already associated with the claims file because there is no disease, injury, event, or service-connected disability to which the claimed disorders could be related. 38 C.F.R. § 3.159(c)(4)(i).

Moreover, as previously noted, the Veteran was afforded an opportunity to present testimony at a hearing before the Board in May 2013. In Bryant v. Shinseki, 23 Vet. App. 488, 496-97 (2010), the Court held that the Veterans Law Judge who chairs a hearing fulfill two duties to comply with 38 C.F.R. § 3.103(c)(2). These duties consist of (1) fully explaining the issues pertinent to the claim(s) on appeal; and (2) suggesting the submission of evidence that may have been overlooked. In this case, the Veterans Law Judge who conducted that hearing set forth the issues to be discussed and sought to identify pertinent evidence not currently associated with the claims folder. The hearing focused on the elements necessary to substantiate the claims, and the Veteran, through his testimony and questioning by his representative, demonstrated his actual knowledge of the elements necessary to substantiate his claims. As such, the Board finds that VA complied with the duties set forth in 38 C.F.R. 3.1 03(c)(2) and Bryant v. Shinseki, 23 Vet. App. 488, 492 (2010). There has been no allegation otherwise. Indeed, the Veteran was offered the opportunity to testify at another hearing, but he declined.

The Board also finds that the AOJ has complied with the Board's June 2014 remand directives. In February 2015, the AOJ contacted the Air Force Historical Research Agency and the Joint Services Records Research Center (JSRRC) to request any individual or unit records from the 13th Tactical Fighter Squadron for November 1967. The AOJ further submitted a Personnel Information Exchange System (PIES) request in May 2015 seeking the Veteran's complete service personnel records. The Air Force Historical Research Agency responded in February 2015, the JSRRC responded in May 2015, and a PIES response was received in June 2015. Therefore, the Board finds that the AOJ has complied with the June 2014 remand directives and will proceed with adjudication. Stegall v. West, 11 Vet. App. 268 (1998). 

For these reasons, the Board concludes that VA has fulfilled the duty to assist the Veteran in this case. Hence, there is no error or issue that precludes the Board from addressing the merits of this appeal.

Law and Analysis

Service connection may be granted for a disability resulting from disease or injury incurred coincident with or aggravated by service. 38 U.S.C.A. § 1110, 1131; 38 C.F.R. § 3.303(a). Service connection on a direct basis may be granted for any disease diagnosed after discharge, when all the evidence, including that pertinent to service, establishes that the disease was incurred in service. 38 C.F.R. § 3.303(d).

Certain chronic diseases, including diabetes mellitus and cardiovascular-renal disease, may be presumed to have been incurred in service if manifested to a compensable degree within one year of separation from active service. 38 U.S.C.A. §§ 1112, 1113, 1137; 38 C.F.R. §§ 3.307, 3.309.

If a chronic disease is shown to be chronic in service, subsequent manifestations of the same chronic disease at any later date, however remote, are service connected, unless clearly attributable to intercurrent causes. 38 C.F.R. § 3.303(b). For the showing of chronic disease in service, there is required a combination of manifestations sufficient to identify the disease entity and sufficient observation to establish chronicity at the time. However, if chronicity in service is not established or where the diagnosis of chronicity may be legitimately questioned, a showing of continuity of symptoms after discharge is required to support the claim. 38 C.F.R. § 3.303(b). A claimant "can benefit from continuity of symptomatology to establish service connection in the ultimate sense, but only if [the] chronic disease is one listed in § 3.309(a)." Walker v. Shinseki, 708 F.3d 1331 (Fed. Cir. 2013).

If a veteran was exposed to an herbicide agent during active military, naval, or air service, certain diseases shall be service-connected if the requirements of section 3.307(a)(6) are met, even though there is no record of such disease during service, provided further that the rebuttable presumption provisions of section 3.307(d) are also satisfied. 38 C.F.R. § 3.309(e). Section 3.307(d)(6) provides that the term "herbicide agent" means a chemical in an herbicide used in support of the United States and allied military operations in the Republic of Vietnam during the period beginning on January 9, 1962, and ending on May 7, 1975. 38 C.F.R. § 3.307(d)(6)(i). Section 3.307(d)(6) also provides that a veteran who, during active military, naval, or air service, served in the Republic of Vietnam during the period beginning on January 9, 1962, and ending on May 7, 1975, shall be presumed to have been exposed during such service to an herbicide agent, unless there is affirmative evidence to establish that the veteran was not exposed to any such agent during that service. 38 C.F.R. § 3.307(d)(6)(iii). Service in the Republic of Vietnam includes service in the waters offshore and service in other locations if the conditions of service involved duty or visitation in the Republic of Vietnam. Id. 

VA has determined that special consideration of herbicide exposure on a factual basis should also be extended to veterans whose duties placed them on or near the perimeters of certain Thailand military bases. See VA Adjudication Procedure Manual, M21-1, Part IV.ii.1.H.5. As such, herbicide exposure should be conceded on a facts found or direct basis if a veteran served in the Air Force in Thailand during the Vietnam era at one of the listed bases as a security policeman, a security patrol dog handler, a member of a security police squadron, or otherwise served near the air base perimeter, as shown by military occupational specialty, performance evaluations, or other credible evidence. M21-1, Part IV.ii.1.H.5.b.

The diseases presumed to be associated with herbicide exposure include: chloracne or other acneform diseases consistent with chloracne, type 2 diabetes (also known as type II diabetes or adult-onset diabetes), Hodgkin's disease, ischemic heart disease (including, but not limited to, acute, subacute, and old myocardial infarction; atherosclerotic cardiovascular disease including coronary artery disease (including coronary spasm) and coronary bypass surgery; and stable, unstable and Prinzmetal's angina), all chronic B-cell leukemias (including, but not limited to, hairy-cell leukemia and chronic lymphocytic leukemia), multiple myeloma, non-Hodgkin's lymphoma, Parkinson's disease, acute and subacute peripheral neuropathy, porphyria cutanea tarda, prostate cancer, respiratory cancers (cancer of the lung, bronchus, larynx, or trachea), and soft-tissue sarcomas (other than osteosarcoma, chondrosarcoma, Kaposi's sarcoma, or mesothelioma). 38 C.F.R. § 3.309(e). For the purposes of § 3.307, the term herbicide agent means a chemical in an herbicide used in support of the United States and allied military operations in the Republic of Vietnam during the Vietnam era. 38 C.F.R. § 3.307(a)(6)(i). Agent Orange is generally considered an herbicide agent and will be so considered in this decision. 

Regulations also provide that service connection may be granted for any disease diagnosed after discharge, when all evidence, including that pertinent to service, establishes that the disability was incurred in service. 38 C.F.R. § 3.303(d); see also Combee v. Brown, 34 F.3d 1039 (Fed. Cir. 1994). In other words, a presumption of service connection provided by law is not the sole method for showing causation in establishing a claim for service connection for disability due to herbicide exposure. See Stefl v. Nicholson, 21 Vet. App. 120 (2007) (holding that the availability of presumptive service connection for some conditions based on exposure to Agent Orange does not preclude direct service connection for other conditions based on exposure to Agent Orange). 

A disability may also be service-connected on a secondary basis if it is proximately due to or the result of a service-connected condition. 38 C.F.R. § 3.310 (a). Moreover, secondary service connection may be established, as well, by any increase in severity (i.e., aggravation) of a nonservice-connected condition that is proximately due to or the result of a service-connected condition. 38 C.F.R. § 3.310 (b); Allen v. Brown, 7 Vet. App. 439, 448 (1995). Where a service-connected disability aggravates a nonservice-connected condition, a Veteran may be compensated for the degree of disability (but only that degree) over and above the degree of disability existing prior to the aggravation. Allen, 7 Vet. App. at 448

In this case, the Veteran has claimed that he currently has diabetes mellitus and ischemic heart disease that are due to herbicide exposure in service. He also has claimed that he has peripheral neuropathy of the lower extremities and erectile dysfunction that are secondary to his diabetes mellitus. See e.g. January 2011 claim; August 2011 notice of disagreement; May 2012 substantive appeal; May 2013 videoconference hearing testimony; January 2015 Decision Review Officer (DRO) hearing testimony. 

In considering the evidence of record under the laws and regulations as set forth above, the Board concludes that the Veteran is not entitled to service connection for diabetes mellitus, ischemic heart disease, peripheral neuropathy of the lower extremities, and erectile dysfunction.

Initially, the Board finds that diabetes mellitus, ischemic heart disease, peripheral neuropathy of the lower extremities, and erectile dysfunction did not manifest in service or for many years thereafter. In this regard, the Veteran's service treatment records are negative for any complaints, treatment, or diagnoses pertaining to diabetes mellitus, elevated blood sugar, ischemic heart disease, heart problems, hypertension, peripheral neuropathy, neurological problems, erectile dysfunction, and genitourinary problems. In fact, a July 1970 separation examination report documented the Veteran as having normal lungs, chest, heart, vascular system, endocrine system, genitourinary system, lower extremities, and neurological system. Moreover, a urinalysis was negative for sugar, and his blood pressure was normal at 110/76. The Veteran also denied having a medical history of dizziness, fainting, shortness of breath, chest pain or pressure, heart palpitations, high or low blood pressure, sugar in his urine, neuritis, and paralysis. 

The earliest evidence of diagnoses for both diabetes mellitus and coronary artery disease is documented in VA medical records dated in June 2007. With regard to lower extremity peripheral neuropathy and erectile dysfunction, the VA treatment records do not reflect any diagnosis or treatment for either condition, despite the Veteran testifying at the May 2013 hearing that he receives his treatment through the VA healthcare system. 

Moreover, the Veteran has not asserted that any of his claimed disorders manifested in service or within one year thereafter. Nor has he claimed that there was a continuity of symptomatology. In fact, during his May 2013 hearing, he stated that that none of the disorders developed within a year of his military service. 

For these reasons, the Board concludes that the diabetes mellitus, ischemic heart disease, peripheral neuropathy of the lower extremities, and erectile dysfunction did not manifest in service or for many years thereafter. There is also no evidence that any medical professional has related diabetes mellitus, ischemic heart disease, lower extremity peripheral neuropathy, or erectile dysfunction to his active service.

As noted above, the Veteran has claimed that he developed diabetes mellitus and ischemic heart disease as a result herbicide exposure in service. In this case, however, the record on appeal currently contains no service department evidence establishing that the Veteran was present on the land mass of Vietnam or in its inland waterways during the Vietnam era. While the Veteran has reported several flights over Vietnam during this deployment to Thailand, and his service personnel records document such flights, he indicated during his May 2013 testimony that he was never shot down and never landed in Vietnam during those flights. 

The Veteran served in the United States Air Force as a pilot and then as a flight training instructor. The service personnel records show that he was stationed in Thailand at the Udorn Royal Thailand Air Force Base (RTAFB) for the entirety of his overseas service from October 1967 to July 1968. The Veteran testified at his first DRO hearing in October 2011 that he also served at Ubon RTAFB and routinely crossed the perimeter of these RTAFBs to get to his aircraft. During the May 2013 hearing, the Veteran specified that he spent roughly half of his time overseas at Ubon RTAFB and the other half at Udorn RTAFB. However, as noted, the service personnel records indicate that he was in Thailand from October 1967 to July 1968 and that he was stationed at Udorn RTAFB for that entire period. There is no documentation to verify the Veteran was stationed at Ubon RTAFB. 

Nevertheless, the Veteran has described a layover at Tan Son Nhat Air Force Base in Vietnam while en route to Jungle Survival School at Clark Air Force Base in the Philippines. In his August 2011 notice of disagreement, he specified that the layover occurred in the fall of 1967. In May 2013 and January 2015, he stated that Air Force members serving in Thailand normally flew military flights out of Bangkok into Clark Air Force Base, but that on this one occasion, monsoons in the Philippines had grounded the outbound flight that was supposed to pick him up in Thailand. He recalled travelling from Bangkok to Saigon on a civilian flight and continuing to Clark Air Force Base on a military flight following a layover. 

The Veteran further claimed at his October 2011 DRO hearing that, as a pilot stationed at the Udorn RTAFB, he was exposed to Agent Orange while traveling within 50 feet of the fence line to get to his airplane. He reiterated this assertion at the May 2013 hearing, stating that he had to take a road near the perimeter of the base around the flight line to get to his job from his barracks. The Veteran further submitted an excerpt from the Project CHECO Southeast Asia Report: Base Defense in Thailand (CHECO Report), which included several references to herbicide use on the fenced-in perimeters of RTAFBs during the Vietnam era and suggested that such herbicides were in use while he was there from October 1967 to July 1968. However, in October 2011, the Veteran also testified that he was not aware of defoliating herbicide use at Udorn RTAFB or Ubon RTAFB. He only knew that he never saw the foliage grow very high along the fence line. 

The Board notes that the aerial map submitted by the Veteran with the CHECO report does not show any road running along the perimeter of the Udorn RTAFB. Rather, the road runs between a cluster of buildings and the runway. While the Veteran testified in May 2013 that his barracks were on one side of the flight line and that his job in operations was on the other side, it would place the runway at the heart of the base. He later contradicted himself, characterizing his barracks at Udorn RTAFB as, "at the heart of the base." VA adjudicators may consider internal inconsistencies, facial implausibility, and consistency with other evidence submitted on behalf of the Veteran. Caluza v. Brown, 7 Vet. App. 498, 510- 511 (1995). Moreover, the Veteran testified as to herbicide exposure at the perimeter of Ubon RTAFB, yet as discussed above, his service personnel records only reflect service at Udorn RTAFB. In addition, the evidence does not show, nor has he asserted, that he served in Thailand as a security policeman, a security patrol dog handler, a member of a security police squadron. Nor do his military occupational specialty or performance evaluations show that he served near the perimeter of an air base in Thailand.

Moreover, as discussed above, the AOJ contacted the Air Force Historical Research Agency and JSRRC to request any individual or unit records from the 13th Tactical Fighter Squadron for November 1967, seeking verification of the Veteran's exposure to herbicides. The Air Force Historical Research Agency responded in February 2015 after having reviewed the unit records for the 13th Tactical Fighter Squadron. While the archivist noted both the unit's location at the Udorn RTAFB during this time period and the Veteran's assignment to this unit, he also noted the lack of any reference to specific personnel travelling to Jungle Survival School in the Philippines by way of Vietnam. The archivist was unable to verity the Veteran's travel to Vietnam. The JSRRC's May 2015 response similarly indicated that they could not confirm that either that the Veteran specifically or any personnel from the 13th Tactical Fighter Squadron had travelled from Udorn RTAFB through Vietnam en route to Jungle Survival School in the Philippines. 

The AOJ also submitted a PIES request seeking the Veteran's complete service personnel records. The June 2015 PIES response indicated that there were no records available beyond those supplied to the RO in April 2014. Earlier, in February 2011, a PIES response had similarly been unable to verify the Veteran's herbicides exposure.

The Veteran's service personnel records do confirm that he completed Jungle Survival School over the course of five days in November 1967. The service personnel records also include several performance evaluations, including a June 1969 performance appraisal reflecting temporary duty at Perrin Air Force Base. However, the performance appraisals during his service in Thailand do not refer to a stopover in Vietnam en route to Jungle Survival School in the Philippines. Specifically, January 1968 and July 1968 performance evaluations review the Veteran's work as a pilot, including flights over Vietnam, but do not reflect that the Veteran ever stepped foot in Vietnam. 

No official service department records establish that the Veteran set foot in Vietnam. The Board finds that Veteran's statements suggesting that he set foot in Vietnam and that he served near the perimeter of the air base in Thailand are lacking in credibility, as they contain some inconsistencies and also contradict the other evidence of record. The Board assigns greater probative weight to the objective contemporaneous record as well as the aerial map submitted than to the statements of the appellant, which were made at a later date and in the context of a claim for monetary benefits. See e.g. Curry v. Brown, 7 Vet. App. 59, 68 (1994) (holding that the contemporaneous evidence has greater probative value than history as reported by a claimant). 

The Veteran has also referenced his combat status based on his receipt of the Distinguished Flying Cross in a January 2015 statement, claiming entitlement to the resolution of reasonable doubt in his favor with regard to the credibility of his statements describing a stopover in Vietnam. The Board is cognizant that U.S.C.A. § 1154(b) states that, when an injury or disease was alleged to have been incurred or aggravated in combat, such incurrence or aggravation may be shown by satisfactory lay evidence, if consistent with the circumstances, conditions, or hardships of service, even if there is no official record of the incident. 38 U.S.C.A. § 1154(b); 38 C.F.R. § 3.304 (d). However, the provisions of 38 U.S.C.A. § 1154(b) do not establish a presumption of service connection. Rather, the regulation allows a combat veteran to use lay or other evidence to prove service incurrence or aggravation of a condition alleged to have been incurred in combat. See Caluza, 7 Vet. App. at 507. However, as the Veteran has not alleged and the record does not suggest that that the claimed stopover in Saigon occurred within the context of combat with the enemy, the combat provisions of 38 U.S.C.A. § 1154(b) are not applicable. 

Based on the foregoing, the Board finds that the Veteran's claims that he had a stopover in the Republic of Vietnam and that he served near the perimeter of a base in Thailand are not credible. See Jefferson v. Principi, 271 F.3d 1072 (Fed. Cir. 2001) (recognizing the Board's inherent fact-finding ability); see also Caluza, 7 Vet. App. at 511, 512 (1995), aff'd per curiam, 78 F.3d. 604 (Fed. Cir. 1996) (discussing the factors to be considered in determining the weight to be assigned to evidence, including inconsistent statements, internal inconsistency of statements, inconsistency with other evidence of record, and witness demeanor). 

For the foregoing reasons, the Board finds that the evidence does not support a finding that the Veteran had herbicide exposure in service.

In addition, the Board finds that the Veteran is not entitled to service connection for peripheral neuropathy of the lower extremities and erectile dysfunction on a secondary basis. The Veteran is not service-connected for any disability. Therefore, those claims must be denied as a matter of law under that theory of entitlement.

In summary, the Veteran has not been shown to have diabetes mellitus, ischemic heart disease, peripheral neuropathy of the lower extremities, and erectile dysfunction in service or for many years thereafter. There was also no disease, injury, or event therein, including herbicide exposure, to which such disorders could be related. Therefore, the Board finds that the preponderance of the evidence weights against the claims.

ORDER

Service connection for diabetes mellitus is denied.

Service connection for ischemic heart disease is denied.

Service connection for peripheral neuropathy of the lower extremities is denied.

Service connection for erectile dysfunction is denied.

____________________________________________
J.W. ZISSIMOS
Veterans Law Judge, Board of Veterans' Appeals

Department of Veterans Affairs