Robert E. SUTTON, Appellant,

v.

Jesse BROWN, Secretary of Veterans Affairs, Appellee.

No. 94–1080.

United States Court of Veterans Appeals.

Nov. 26, 1996.

554

Larry A. Weiser was on the brief for the appellant.

Mary Lou Keener, General Counsel; Ron Garvin, Assistant General Counsel; R. Randall Campbell, Deputy Assistant General Counsel; and Mary Ann Flynn, Washington, DC, were on the brief for the appellee.

Before KRAMER, MANKIN *, and STEINBERG, Judges.

STEINBERG, Judge:

The appellant, World War II veteran Robert E. Sutton, appeals a September 12, 1994, Board of Veterans' Appeals (BVA or Board) decision denying service connection for rheumatic heart disease and rheumatoid arthritis, including spondylitis. Record (R.) at 29. For the reasons that follow, the Court will vacate the BVA decision and remand the matter to the Board for further proceedings consistent with this opinion.

* Judge Mankin participated in this case, but died

## I. Background

The veteran had active service in the U.S. Navy from July 1942 to January 1943. R. at 52. A report of an induction physical examination in July 1942 did not identify any abnormalities or defects, and specifically noted that his "[s]pine and extremities" and "[h]eart and blood vessels" were "[n]ormal". R. at 40. An entry in the veteran's service medical records (SMRs) for July 14, 1942, noted that he suffered a contusion of the right knee after falling from a hammock, while sleeping, and striking that knee. R. at 40. He complained of a "[s]wollen and tender knee", and such symptoms were confirmed upon examination. *Ibid.* Hot boric acid compresses were prescribed, and two days later he was "well" and discharged to duty. *Ibid.* A July 25, 1942, entry stated that he had been brought to the dispensary on a stretcher and complained of an " 'inability' to breathe and general weakness". R. at 41. The entry noted that, on the previous day, the veteran had received a typhoid shot. *Ibid.* An examination revealed a temperature of 102 degrees, "very tender" back muscles, an "urticarial eruption on upper trunk", and general malaise. *Ibid.* (Urticaria is "an allergic disorder marked by raised edematous patches of skin or mucous membrane and us[ually] intense itching and caused by contact with a specific precipitating factor either externally or internally (as by a food, drug, or inhalant)", WEBSTER'S MEDICAL DESK DICTIONARY 747 (1986) [hereinafter WEBSTER'S]. Edema is "an abnormal excess accumulation of serous fluid in connective tissue or in a serous cavity", WEBSTER'S at 200.) The diagnosis was "anti-inoculation, typhoid". R. at 41. Four days later, he was discharged to duty. *Ibid.*

A November 27, 1942, entry noted that the veteran's mental state was examined because of a "general lack of cooperation and disobedience of orders". *Ibid.* While hospitalized, he admitted that he had been "playing dumb" to avoid sea duty. R. at 41, 43. A physical examination revealed no abnormalities; his heart was "[w]ithin normal limits of percussion", had regular rhythm, and showed

before its final disposition.

no murmurs. R. at 42. A report of a psychiatric examination noted that the veteran's conduct "only exaggerated an existing intellectual incapacity" which "appears to be clearly indicated by the distinctly puerile judgment and shallow emotionality that [he] shows now". R. at 42–43. His diagnosis was changed to "constitutional psychopathic state, [i]nadequate personality", which "existed prior to enlistment". R. at 43. In December 1942, a report from the U.S. Navy Board of Medical Survey confirmed the above diagnosis and recommended that he be discharged from the Navy. R. at 43, 47–48. The veteran concurred with these findings. R. at 49. The U.S. Navy Bureau of Medicine and Surgery also recommended that he be discharged by "reason of unsuitability rather than for physical or mental disability". R. at 50. A January 29, 1943, SMR entry noted that he was "[d]ischarged this date (Special Order) from the U.S. Naval Service in accordance with the approved recommendation of [the] Board of Medical Surgery . . . ." R. at 44.

May 1943 medical records from St. Luke's Hospital in Duluth, Minnesota, stated that the veteran had been admitted in May 1943 for one day because of edema of the right knee. R. at 254. A report related his statement that he had had "sporadic edema of both knees and wrists and at times of the eyelids". *Ibid.* Examination revealed "only slight edema of the right knee". *Ibid.* The diagnosis was urticaria. *Ibid.* In March 1944, the veteran filed with a Veterans' Administration (now Department of Veterans Affairs) (VA) regional office (RO) a claim for VA service-connected disability compensation for "battle fatigue in service—Nov. 24, 1942". R. at 58. A May 1944 VA physical examination report noted his complaints of nausea when excited, sore mouth, and dizzy spells. R. at 63. The report stated that he had been seen at St. Luke's Hospital in Duluth "for two weeks in June 1943 on account of swelling and pain in knees, feet[,] and hands" and had been under the care of Dr. Jessico. R. at 489. The report noted a "mitral systolic murmur at apex when lying on left side". R. at 65. History included the veteran's statement that "he had peculiar dizzy spells on one occasion while under fire"; that since his discharge "he has had spells when he has felt dizzy" and has "had a peculiar sensation in his head as tho[ugh] his eyes were turning inward and [has had] peculiar sensations in his arms"; and that the "last occasion was a week ago". *Ibid.* Results of a psychiatric and neurological examination included a "marked vasomotor instability and tremors of the upper extremities when under tension." *Ibid.* The report noted that there was no articular or muscular rheumatism. R. at 66. The diagnosis included, inter alia, "[o]bservation [m]itral [r]egurgitation". R. at 68. (Mitral regurgitation is the "backward flow of blood into the atrium due to mitral insufficiency"; mitral insufficiency is the "inability of the mitral valve to close perfectly[,] permitting blood to flow back into the atrium and leading to various degrees of heart failure", WEBSTER's at 443.) In May 1944, a VARO denied, inter alia, service connection for a systolic murmur. R. at 73.

The veteran was admitted to a VA facility in June 1945 for treatment of a diagnosed chronic arthritis with acute exacerbation. R. at 83, 261. History included his account that he had experienced "an attack of stiffness and soreness with some swelling in the left elbow and shoulder while in service in December 1942"; that he had had a similar attack in 1943; that in April 1945, while working in a cold and damp climate, he had begun to have severe pain in the right knee and both ankles and feet; and that he was then having "considerable pain in the bottom of both heels" when pressure was applied. R. at 264. He was discharged in October 1945 with the following diagnoses: "Arthritis, rheumatoid, chronic, moderately severe", "[b]lepharitis, chronic", and "[c]onjunctivitis, chronic". R. at 83, 264. A November 1945 VA medical certificate noted the veteran's complaints of severe pain in both feet and diagnosed him as having severe arthritis of both ankles. R. at 93. In a June 1946 letter to VA, his guardian sought VA hospital treatment for the veteran, stating that he had first become interested in the veteran's present feet disability and anxiety after the veteran had been injured while working on the railway. R. at 96–97.

A May 1947 VA physical examination reported articular or muscular rheumatism in the ankles, back, and fingers of the veteran, and provided a diagnosis of, inter alia, "rheumatoid arthritis of both ankles, left foot, and both hands" and "[p]ossible rheumatic heart disease, active". R. at 114–19. An August 1947 RO decision denied, inter alia, service connection for these conditions. R. at 122.

The veteran was hospitalized at a VA facility for 17 days in 1949 for, inter alia, "[r]heumatic heart disease with mitral insufficiency and stenosis, aortic stenosis; [m]anifestations of paroxysmal tachycardia . . ., inactive" and "[d]eformity of the left toes, secondary to rheumatoid[ ] arthritis". R. at 148, 150. In 1952, he was hospitalized at another VA facility for one week for "[p]robable spasm in cardiac end of esophagus or colon". R. at 171. The medical records noted "a normal sized heart, tones regular, and strong—no characteristic murmurs", normal chest x-rays, and no visible "evidence of rheumatic heart disease". R. at 172.

A 1961 VA medical record noted rheumatoid arthritis of the back region based on x-rays. R. at 216. A 1961 letter from Dr. Moses, a private physician, stated that he had last seen the veteran in 1960 and that the veteran had then had rheumatoid arthritis in his back, and that a review of 1959 x-rays revealed evidence that this condition was of "long standing". R. at 223. An October 1961 RO decision declined reopening of the veteran's claim for rheumatoid spondylitis. R. at 226.

VA medical examination reports in 1962 and 1963 showed treatment for, and a diagnosis of, rheumatoid spondylitis (R. at 234, 247, 257) and "[d]orsal contraction of toes, cause not determined" (R. at 234). As to the veteran's hands, wrists, hips, and ankles, the examiner noted that there was "no evidence of arthritis either rheumatoid or hypertrophic" but that the veteran's left foot showed "a slight degree of hallux valgus deformity, and both feet show large osteophytic spur formation attached to the plantar aspects of both os calci". R. at 237. (Os calcis is the large bone of the heel, WEBSTER'S at 400, 93.) A February 1963 RO decision denied service connection for rheumatoid arthritis. R. at 266.

A March 1982 x-ray report of the veteran's spine showed slight spurring and a "normal appearance of sacroiliac joints in both sides". R. at 277–78. Views of his right knee showed "minor spurring of tibial spine and of patella"; his left-knee joint showed "presence of fabella". R. at 278. (Fabella is a small fibrocartilage in the tendon of the calf muscle of the leg, WEBSTER'S at 233, 260.) An April 1982 x-ray report of his feet revealed "hallux valgus deformity of both sides". R. at 279. Views of both shoulders suggested "degenerative changes associated with chronic strain or aging". R. at 280. A VA medical examination in July 1982 reported the veteran's complaints of, inter alia, back pain and swelling of his right knee and left foot. R. at 294. The report also noted no murmurs and a normal-sized heart. R. at 295. The diagnosis was, inter alia, bilateral hammer toes and "[p]ains in the shoulders, neck[,] and back[,] subjective and historical, pain and ecchymosis of the left foot probably due to hammer toes." R. at 297. (Ecchymosis is "the escape of blood into tissues from ruptured blood vessels marked by a livid black-and-blue or purple spot or area", WEBSTER'S at 198.) An October 1982 RO decision refused to reopen his claims for service connection for, inter alia, back and foot disorders. R. at 300.

In January 1988, the veteran requested reopening of his arthritis claim and sought service connection for rheumatic heart disease. R. at 340. He informed VA that he was then being treated at the Spokane, Washington, VA Medical Center (MC) for a heart problem, "which my attending physician states is long-term, stemming from rheumatic heart disease", and that he had first experienced this problem during service and had been treated for it for approximately 3 years, from 1943 through 1945. *Ibid.* In a February 1988 statement to VA, he stated: "My attending physician, Dr. Limber, states that the heart condition for which I am presently being treated is a long-standing problem which may be directly connected to some medications I had [been] administered while on active duty and the residuals of a serious

fall I suffered (also while on active duty)." R. at 349. Spokane VAMC medical records showed that he was hospitalized for approximately four days in January 1988 for treatment of "mitral stenosis, echo evidence of mitral valve" and "articular flutter, slow ventricular response". R. at 353. Dr. Limber's report included the following:

Had rheumatic fever at age 19, [and] was hospitalized a year. Had only traumatic joint pains in recent years but had marked joint symptoms with no known carditis, no history of murmur.... No chest pain, dyspnea, sweats, fever[,] or lumps in skin. Physical examination revealed slow ventricular rate, diastolic rumble, loud mitral first sound, expiratory splitting of the first sound suggesting a possible snap. No signs of congestive heart failure.

*Ibid.*

The veteran was then transferred to the Portland, Oregon, VAMC for further evaluation because of the echo findings. *Ibid.* A report of medical history included his account that he had had rheumatic fever as a teenager. R. at 354. The diagnosis was essentially the same as at the Spokane VAMC. R. at 354. The examining physician believed him to have "slight right ventricle enlargement, a very calcific mitral valve, [and] slight left atrial enlargement", and her notes stated that "[b]ecause [the veteran] had rheumatic fever as a child with mitral stenosis", lifelong Coumadinization was recommended. R. at 355. (Coumadin is an anticoagulant that is used, inter alia, to reduce recurrent myocardial infarction, PHYSICIANS' DESK REFERENCE 926 (50th ed.1996)). He was returned to the Spokane VAMC, given medication by a VA physician there, and diagnosed as having "mitral stenosis rheumatic". R. at 356–57. In April 1988, the veteran was readmitted to that VA facility because of increased vertigo and light-headedness and diagnosed as having "mitral stenosis with slow auricular fibrillation". R. at 369. Dr. Limber noted that the veteran "had rheumatic fever at age 20 [the veteran was 17 years old when he entered service, R. at 52] and a prolonged hospitalization with some joint pains following, but the rheumatic heart disease with mitral stenosis was just diagnosed in January

1988." *Ibid.* Dr. Limber also reported that the veteran's recent chest x-rays showed no heart enlargement and that his cardiogram showed auricular fibrillation. R. at 370. An August 1988 RO decision declined reopening of the veteran's rheumatic-heart-disease claim. R. at 385.

In January 1989, he requested service connection for residuals of a head injury and also noted "a bum heart", stress, and headaches that he stated he had had for 47 years. R. at 393–98. June 1989 medical records from the Salt Lake City, Utah, VAMC reported a diagnosis including "[h]istory of rheumatic heart disease with mitral stenosis, status post mitral valve replacement times two" and "[l]eft ventricular pacemaker implantation". R. at 416. The discharge summary reported: "Review of the [veteran's] past medical history reveals that he has had rheumatic heart disease at the age of 20" and that in March 1989 he had a mitral valve replaced surgically and a permanent pacemaker installed. R. at 416, 442. Subsequently, the RO and then the Board denied service connection for residuals of a head injury. R. at 404, 478, 500.

In February 1991, the veteran again requested that his claim for rheumatic heart disease be reopened. R. at 483. He stated that that condition was the "result of rheumatic fever which was diagnosed [and] treated in Duluth, Minnesota, right after [he] was discharged from the military" and that, when he left the Navy in 1943, he had "severe health problems", one of which was a "swelling of [his] joints, especially [his] legs and ankles". R. at 485. He noted, inter alia, that in March 1943 he had been "diagnosed with rheumatic fever at Milwaukee General Hospital", and that during the period of May through July 1943 he had been hospitalized at the Duluth VAMC with the same diagnosis. *Ibid.*

Medical records from Dr. Shaw, Chief of Surgery at the Spokane VAMC, included the following June 1991 entry:

Patient has good history for rheumatic fever while in the [N]avy. Never diagnosed but discharged because he kept complaining of joint pain. Has had mitral valve replacement at VA Salt Lake, March 24

[illegible]. His disability has been stopped. I think this is in error. Patient should have C[ompensation and] P[ension] exam[ination and] be reevaluated. Disease well documented in 4 volumes of VA charts.

R. at 506–07. An August 1991 RO decision denied service connection for rheumatic heart disease and rheumatic arthritis, including spondylitis, stating that the cited evidence was dated "many years after service and does not establish onset of heart disease or rheumatoid arthritis either during active duty or within one year following discharge." R. at 509. That same month, the veteran filed a Notice of Disagreement. R. at 513. An October 1991 letter from his representative restated the issue on appeal as service connection for "residuals of rheumatic fever to include rheumatic heart disease and rheumatic arthritis, including spondylitis". R. at 521. In December 1991, he filed a VA Form 1–9 (Substantive Appeal to BVA) requesting a hearing. R. at 529. In an August 1992 BVA decision, the Board found that no new and material evidence had been submitted to reopen claims for service connection for either rheumatic heart disease or rheumatoid arthritis. R. at 547–54. The Board noted specifically that there was no evidence to support a conclusion that the veteran had developed rheumatic fever after an inoculation during service. R. at 552.

In November 1992, the veteran submitted a motion for BVA reconsideration, contending that the connection between a typhoid inoculation and rheumatic heart disease was documented in a medical journal article, IgG RHEUMATOID FACTORS BEHAVIOUR IN YOUNG MALE SUBJECTS FOLLOWING VACCINATION [hereinafter Rheumatoid Factors article], and attached as exhibits that article and a November 22, 1992, letter from Dr. Shaw, a consultant in vascular surgery at the Spokane VAMC. R. at 556–58, 569–70. The Rheumatoid Factors article stated that a study had been conducted on the behavior of Rheumatoid Factors of the IgG class in a group of young subjects serving in the Army when they received anti-typhoid and antitetanic vaccinations. R. at 582. It contained the following conclusion:

IgM rheumatoid factors became transitory positive in a significant proportion. IgG rheumatoid factors demonstrated a two-phase increase, more evident after the second dose of vaccine. We can conclude, mainly for the latest parameter, that these results reveal an autoimmune serological response, even quantitatively modest, concomitant to the specific sensitization resulting from vaccination.

R. at 582.

Dr. Shaw's letter stated that it was written at the request of the veteran "who is trying to have his claim for service[-]connected disability reinstated". R. at 569. The veteran had been service connected for a psychiatric disorder for which he had received compensation from July 1943 until service connection was severed in 1954. *See* R. at 478. Dr. Shaw explained that he had examined the veteran at the Spokane VAMC in June 1991 in the Vascular Surgical Clinic and summarized his findings as follows:

[The veteran] had a good history for rheumatic fever which he suffered while on active duty in the U.S. Navy during World War II. He had his old records with him at the time I saw him from both the Navy [and VA].

He was hospitalized for swollen [and] aching joints after a febrile episode which occurred after typhoid fever inoculation was done.

[The veteran] was discharged from the Navy following this episode and one of the diagnoses listed was possible rheumatic fever.

As a civilian the following year the diagnosis was made by a civilian physician and a heart murmur, which had not been present on his induction into the Navy, was discovered.

As the years progressed the heart murmur became worse. On examination at the VA Hospital at Salt Lake City[,] Rheumatic Mitral Stenosis was diagnosed and a mitral valve replacement operation was done. [The veteran] has done well since the surgery but he has to remain on chronic anticoagulation therapy [Coumadin apparently] since the operation. This will be necessary for the rest of his life.

[The veteran] told me his disability [compensation] had been stopped because it had been determined that his [r]heumatic [h]eart disease was not service connected. I believe this to be in error because of the history above. This is a more or less classical history of [r]heumatic fever and its sequellae.

R. at 570.

The motion for reconsideration was granted in February 1993. R. at 594. In September 1993, the veteran, through counsel, submitted a memorandum of authorities with respect to this matter. R. at 598–605. In the memorandum, counsel for the veteran contended: "As part of the military's diagnosis upon release from the hospital, [the veteran] had possible rheumatic heart disease." R. at 599. (The Court notes that the SMRs in the record on appeal (ROA) do not include such information.)

During reconsideration, the Board notified the veteran in September 1993 that it had decided "to undertake additional inquiry concerning the medical question involved in this case" and was requesting an independent medical opinion (IMO) from a medical expert. R. at 609. The Board informed the veteran that, after receipt of the requested opinion, the veteran would "be given 60 days within which to respond" and that the Board would then "proceed with its review of all the evidence". *Ibid.* In January 1994, apparently in response to a December 1993 status inquiry letter from the veteran's counsel (*see* R. at 617), the Board referred to its September 1993 letter, explained that the preparation of the IMO was still under review, and stated: "At the conclusion of the review, a report will be provided to the Board and it in turn will provide a copy to you in order that you will have an opportunity to comment on the report before it is considered by the Board." R. at 617. In a February 1994 letter to Dr. Meehan, Associate Professor, University of Colorado Department of Medicine, Division of Rheumatology, the Board summarized the content of some of the veteran's medical records, identified six specific questions to be addressed in the IMO, and enclosed the VA claims file. R. at 621–22. The Board's letter omitted reference to SMRs showing a reac-

tion to the in-service typhoid shot; explained its conclusion that the veteran was not a credible witness by referring to his criminal record, two marriages, and varied stories regarding his service experience; and also noted that Dr. Shaw's "June 1991 note" was "apparently based on false information given to the doctor by the veteran". R. at 619–20.

In a March 1994 IMO, Dr. Meehan noted that he had reviewed the records sent to him and had concluded that (1) the Rheumatoid Factors article "does not support the 'hypothesis that a vaccination can cause rheumatic fever' or 'rheumatic arthritis' " because the study involved only 15 subjects who did not develop a serum sickness reaction or other evidence "that would suggest a causative role of this inoculation with any autoimmune illness" and because "rheumatoid factor positivity is not necessary for the diagnosis of rheumatoid arthritis" (R. at 625); (2) as to the veteran's symptoms on the July 1942 SMR, his "febrile reaction was typical for a serum sickness type reaction post vaccination" and he "did not meet criteria nor exhibit any major criteria for rheumatic fever as there was no documentation of carditis, polyarthritis, subcutaneous nodules, erythema marginatum[,] or chorea" (*ibid.*); and (3) the May 1943 medical records as to swelling did not "provide documentation of either an acute episode of polyarthritis, rheumatic fever[,] or a systemic autoimmune disease such as rheumatoid arthritis or ankylosing spondylitis" (R. at 626). Dr. Meehan concluded that, having reviewed all of the medical records, he could not "find one single episode of objective synovitis that would corroborate a diagnosis of rheumatoid arthritis" or that showed that the veteran had "ever met criteria for rheumatoid arthritis"; however, he acknowledged that he had not reviewed the 1959 x-ray report which "read as 'rheumatoid spondylitis' ". R. at 626. Dr. Meehan also stated:

During his brief time ... in the service [the veteran] was seen by multiple medical examiners and not one medical officer diagnosed him as having acute rheumatic fever[;] therefore[,] I think that it is most unlikely that he acquired rheumatic fever in the service. There is some indirect

information that he was hospitalized in a civilian hospital in 1945 for a prolonged period with swelling of multiple joints "requiring casting"[,] and I suspect that episode may have been consistent with rheumatic fever. Prolonged hospitalization for polyarthritis requiring that type of management was typical at that time for treatment of acute rheumatic fever. As I mentioned earlier, the cited article is irrelevant to any of the questions that are pertinent in this case since there is no objective evidence that he acquired rheumatic fever while [he] was in the service[,] and [he] does not have evidence of rheumatoid arthritis or ankylosing spondylitis.

R. at 627.

A May 1994 letter to the BVA from the veteran's counsel enclosed a letter of that same month from Dr. Coleman, a private physician, stating: "By way of this letter and the enclosed letter from Dr. Coleman, this completes our comment in the above-referenced matter." R. at 629. Dr. Coleman's letter noted that he had reviewed the veteran's SMRs and VA records, and concluded:

[I]t is my medical opinion that [the veteran] had the onset of valvular heart disease following some type of condition while he was in service. While it appears most likely that this was rheumatic fever with subsequent mitral valve complications, it is certainly feasible that there was another etiology, but again the primary issue appears to be whether or not this was acquired while in the service. In his situation, it appears highly probable that this was the case.

R. at 631. Dr. Coleman also concluded that the veteran "did have onset of rheumatic fever while he was in the service". R. at 630. He explained that rheumatic fever "has multiple major manifestations which include carditis, migratory polyarthritis, chorea, erythema marginatum, and subcutaneous nodules" as well as joints that are red, swollen, and warm, frequently in wrists, elbows, knees, and ankles. *Ibid.* He also stated that it was "not uncommon that cardiac problems are not discovered until much later" and that "[s]ome sources state that up to 50[%] of adults with rheumatic heart disease have not

been aware of a prior episode of rheumatic fever". R. at 631. He stated the following basis for his conclusions:

[The veteran] experienced symptoms which certainly could be consistent with a rheumatic fever picture. This happened to follow a typhoid inoculation. His military records indicate [that] he did not have a heart murmur on his induction into the service, and shortly following his discharge a cardiac murmur was detected. He had an inoculation of typhoid and had a febrile reaction, which in the records was described as an urticarial eruption.

*Ibid.* He concluded that "[i]t is very probable that this patient had a concurrent or subsequent streptococcal infection" and "[w]hile less likely, it is certainly possible that in such a patient there can be heart nodules following typhoid vaccination." *Ibid.* He also noted that, because the veteran was hospitalized for four days in July 1942 and not much clinical information had been provided in the SMRs, valuable information was missing and "may quite possibly mean he was not examined well". *Ibid.*

In the September 1994 BVA decision here on appeal, an expanded panel of the Board reconsidered the veteran's claims and found that new and material evidence had been submitted and denied both claims on the merits. R. at 11, 28. The Board found that the March 1994 IMO "provides the best analysis of the actual facts in relation to the pertinent medical principles" and that the analysis "points to the conclusion that the veteran did not have a chronic rheumatic disease during his brief active military service". R. at 28. The Board concluded that "the actual medical records and the preponderance of credible medical opinion form a preponderance of evidence against the veteran's claim". *Ibid.*

## II. Analysis

The appellant, through counsel, maintains that the Board's decision denying the claims should be reversed because the Board failed to consider the benefit-of-the-doubt rule, made improper findings in discrediting the medical opinions of Dr. Shaw and Dr. Coleman, and failed to give sufficient reasons or

bases for discounting those opinions. Brief (Br.) at 4–6.

### A. New and Material Evidence

Under the applicable law, the Secretary must reopen a prior final disallowance of a claim when "new and material evidence" is presented or secured with respect to the basis for the disallowance of that claim. *See* 38 U.S.C. §§ 5108, 7104(b). On a claim to reopen, a "two-step analysis" must be conducted under section 5108. *Manio v. Derwinski,* 1 Vet.App. 140, 145 (1991). First, it must be determined whether the evidence presented or secured since the last final disallowance of the claim is new and material. *See Blackburn v. Brown,* 8 Vet.App. 97, 102 (1995); *Cox v. Brown,* 5 Vet.App. 95, 98 (1993); *Colvin v. Derwinski,* 1 Vet.App. 171, 174 (1991). Second, if the evidence is new and material, the Board must then reopen the claim and "review the former disposition of the claim", 38 U.S.C. § 5108—that is, review all the evidence of record to determine the outcome of the claim on the merits. *See Jones (McArthur) v. Derwinski,* 1 Vet.App. 210, 215 (1991). A Board determination as to whether evidence is "new and material" for purposes of reopening is a question of law subject to de novo review by this Court under 38 U.S.C. § 7261(a)(1). *See Masors v. Derwinski,* 2 Vet.App. 181, 185 (1992); *Jones,* 1 Vet.App. at 213; *Colvin, supra.*

The Court has recently held:

> The first step of the *Manio* two-step process as to a claim to reopen involves three questions: **Question 1:** Is the newly presented evidence "new" (that is, not of record at the time of the last final disallowance of the claim and not merely cumulative of other evidence that was then of record, *see Struck v. Brown,* 9 Vet.App. 145, 151 (1996); *Blackburn, Cox,* and *Colvin,* all *supra* )? **Question 2:** Is it "probative" of "the issue[s] at hand" (*Cox* and *Colvin,* both *supra* ) (that is, each issue which was a specified basis for the last final disallowance (*see Struck, supra* ))? **Question 3:** If it is new and probative, then, in light of all of the evidence of record, is there a reasonable possibility that the outcome of the claim on the mer-

its would be changed (*see ibid.*)? As *Blackburn* indicated, affirmative answers to both questions 2 and 3—involving the probative nature of the "new" evidence and the reasonable possibility of outcome change, respectively—are required in order for "new" evidence to be "material".... *Blackburn, supra.* As to those two "materiality" components, the credibility of the newly presented evidence is generally presumed under *Justus* [*v. Principi,* 3 Vet.App. 510, 513 (1992) ] and *Duran* [*v. Brown,* 7 Vet.App. 216, 220 (1994) ]. In looking at the first materiality component (whether the evidence found to be "new" is also probative) the focus is on the new evidence; as to the second materiality component (whether there is a reasonable possibility that the outcome on the merits would be changed), the focus is on *all* of the evidence of record rather than just on the new evidence. *See Struck* and *Blackburn,* both *supra; Glynn v. Brown,* 6 Vet.App. 523, 528–29 (1994); *Cox* and *Colvin,* both *supra.*

*Evans v. Brown,* 9 Vet.App. 273, 283 (1996).

As to the probativeness inquiry in question 2, above, the Court held that the newly presented or secured evidence "must tend to prove the merits of the claim as to each essential element that was a specified basis for that last final disallowance of the claim" but "need not be probative of all elements required to award the claim". *Id.* at 283–84 (citing *Caluza v. Brown,* 7 Vet.App. 498, 506 (1995), *aff'd per curiam,* 78 F.3d 604 (Fed. Cir.1996) (table) (describing three elements of a well-grounded service-connection claim)). As to the inquiries involved in questions 1 and 3, above, the "prior evidence of record is vitally important in determining newness as well as the reasonable possibility of a changed merits outcome for purposes of deciding whether to reopen a claim." *Evans,* 9 Vet.App. at 284. "[T]he reasonable possibility of a changed outcome can be decided only by reviewing de novo the same evidence (that is, all of it) that would be reviewed were the claim actually to be reopened and the former negative disposition on the merits reevaluat-

ed." *Ibid.* (citing *Jones*, 1 Vet.App. at 214; *Masors* and *Colvin*, both *supra* ).

In *Evans*, the Court held that sections 5108, 7104(b), and 7105(c) require that to reopen a previous final disallowance of a claim (whether decided by the BVA or an RO) "there must be 'new and material evidence presented or secured' since the time that the claim was finally disallowed on any basis, not only since the time that the claim was last disallowed on the merits." *Evans*, 9 Vet.App. at 285. In so holding, the Court concluded that the meaning of the term "disallowed" in section 5108 included a disallowance by the BVA or an RO, "refusing, because of a lack of new and material evidence, to reopen a previously and finally disallowed claim [because such a denial] is, in the truest sense of the word, another 'disallowance' of a claim—the claim to reopen—because that claim is not being 'allowed'." *Ibid.*

■ *1. Rheumatic Heart Disease.* Since the RO's last final disallowance in August 1988 as to the claim for service connection for rheumatic heart disease (R. at 385), the veteran has submitted new and material evidence warranting reopening of this claim. *See Evans, supra* (to reopen, evidence must be newly presented since time of last final disallowance on any basis). Specifically, Dr. Coleman's May 1994 letter (R. at 629) provided evidence that was not cumulative of any already in the file and was probative of the issue at hand—whether the appellant's current rheumatic heart disease was a residual of his having suffered rheumatic fever in service. *See Evans, Struck,* and *Colvin*, all *supra*. Dr. Coleman reviewed the appellant's SMRs and postservice medical records and concluded that the veteran "had the onset of valvular heart disease following some type of condition while he was in service"; that it was "most likely that this was rheumatic fever with subsequent mitral valve complications"; that it "appears highly probable that this was the case"; and that it was "not uncommon that cardiac problems are not discovered until much later". R. at 631. This newly presented, probative evidence, when viewed with all the other evidence of record, creates a reasonable possibility of changing the outcome on the claim for ser-

vice connection of rheumatic heart disease. *See Evans, Cox,* and *Colvin*, all *supra.*

■ *2. Rheumatoid Arthritis.* As to the appellant's claim for service connection for rheumatic arthritis, whether or not as a residual of rheumatic fever, no material evidence has been submitted since the RO's February 1963 last final disallowance of that claim (R. at 266). Dr. Coleman's report provided evidence of the veteran's having suffered rheumatic fever during service and opined generally that joint problems are usually symptoms of rheumatic fever (R. at 630), but it did not connect that condition with the chronic arthritis diagnosed by VA in June 1945 (R. at 83, 261), the arthritis in both ankles diagnosed by VA in November 1945 (R. at 93), the rheumatoid arthritis in both ankles, back, left foot, and both hands diagnosed by VA in 1947 (R. at 119), the rheumatoid spondylitis diagnosed by VA medical examinations in 1962 and 1963 (R. at 234, 247, 257), or otherwise provide evidence of a connection between the veteran's service and the joint pains noted in January 1988, the most recent medical report concerning his arthritic condition (R. at 353). Dr. Coleman's report is thus not probative of the issue at hand, the element of the claim relating to a nexus between the veteran's service and his current arthritic condition. *See Evans,* 9 Vet.App. at 286; *Moray v. Brown,* 5 Vet.App. 211, 214 (1993) (evidence of medical causation required to reopen claim under 38 U.S.C. § 5108). Although the BVA denied the arthritis claim on the merits, its doing so was not prejudicial to the appellant because he was not entitled to a merits adjudication, there having been no new and material evidence presented as to this claim. *See* 38 U.S.C. § 7261(b) (Court must give due consideration to rule of prejudicial error); *cf. Edenfield v. Brown,* 8 Vet.App. 384, 390 (1995) (en banc) (holding that when Board incorrectly finds claim to be well grounded and then denies it on merits, Board's error is not prejudicial to appellant and BVA decision will be affirmed as to disallowance of claim). Accordingly, the BVA decision will be affirmed as to the rheumatic arthritis claim.

### B. Reopened Heart–Disease Claim

**1. Austin Error.** In *Thurber v. Brown*, the Court held that before the BVA relies on any evidence developed or obtained by it subsequent to the issuance of the most recent Statement of the Case (SOC) or Supplemental SOC (SSOC), the BVA must provide the claimant with reasonable notice of such evidence and of the reliance that the Board proposes to place on it and provide a reasonable opportunity for the claimant to respond to it. *Thurber*, 5 Vet.App. 119, 126 (1993). Thereafter, in *Austin v. Brown*, the Court expanded upon *Thurber* and held that a BVA decision must be set aside where, at least in part, it "rests upon a medical opinion procured by a process that violates both the express holding of *Thurber supra*, and the fair process principle underlying *Thurber*." *Austin*, 6 Vet.App. 547, 551 (1994). The Court further expounded in *Austin* that a claimant's reasonable opportunity to respond "was not limited to argument or comment, but also included the claimant's right to submit additional evidence." *Ibid.*

In the instant case, the latter *Austin* requirement was violated insofar as the record contains no indication that the claimant was expressly informed, directly or though his counsel, that he could submit additional evidence in response to Dr. Meehan's March 1994 IMO. Rather, in January 1994, the Board had advised the veteran's counsel that the claimant would "have an opportunity to comment on the [IMO] report before it is considered by the Board." R. at 617. However, just as clearly, the veteran was not prejudiced by this deficiency because his counsel did, in fact, submit additional evidence, in the form of Dr. Coleman's May 1994 letter, and stated that that letter "complete[d] our comment in the above-referenced matter." R. at 629. *See* 38 U.S.C. § 7261(b); *Booton v. Brown*, 8 Vet.App. 368, 372 (1995) (although no indication in ROA that Board had notified appellant that it was obtaining Board medical advisor opinion (BMAO), had provided him with copy of it, and had given him 60 days to respond, any Board failure to follow its own procedures was error not prejudicial to appellant where BVA had remanded to RO, after obtaining BMAO, for development of further evidence). Hence, no remand is in order because of the *Austin* violation.

Having determined that new and material evidence was presented to reopen the rheumatic heart-disease claim, the Court will turn to the review of the Board's merits adjudication of this claim. Before the question arises whether denial of the claim was clearly erroneous under 38 U.S.C. § 7261(a)(4), as lacking a plausible basis in the record, *see Gilbert v. Derwinski*, 1 Vet.App. 49, 52–53 (1990), the Court must first address certain procedural issues. As will be explained below, those procedural issues are dispositive of this appeal.

**2. Prejudice Standard under Bernard.** In *Bernard v. Brown*, the Court noted that "several statutory and regulatory provisions establish extensive procedural requirements to ensure a claimant's rights to full and fair assistance and adjudication in the VA claims adjudication process" and that a claimant must be afforded the "full benefits of these procedural safeguards". *Bernard*, 4 Vet.App. 384, 393–93 (1993) (citing, e.g., 38 U.S.C. §§ 5104, 7105(d)(1); 38 C.F.R. §§ 3.103(a), 19.29, 19.131). The Court held that when the Board addresses in its decision a question that has not been addressed by the RO, it must consider (1) whether the claimant has been given both adequate notice of the need to submit evidence or argument on that question and an opportunity to submit such evidence and argument and to address that question at a hearing, and (2) whether, if such notice has not been provided, the claimant has been prejudiced thereby. *Bernard*, 4 Vet.App. at 394. The Court further concluded in *Bernard* that "a BVA decision that a claimant will not be prejudiced by its deciding a question or questions not addressed by [an RO] must be supported by an adequate statement of reasons' or bases" under 38 U.S.C. § 7104(d)(1). *Ibid.* The Secretary contends that it was nonprejudicial error for the Board to adjudicate the appellant's claims on the merits without first remanding the matter to the RO, without having asked him if he had any objection to the Board's adjudication in the first instance, and without having explained to him how he

might be prejudiced by such Board action. Br. at 18–19.

The August 1991 RO decision, which underlies the September 1994 Board decision here on appeal, denied the veteran's claim to reopen, finding that the evidence submitted was dated "many years after service and does not establish onset of heart disease or rheumatoid arthritis either during active duty or within one year following discharge". R. at 509. On appeal, in its August 1992 decision the Board found, as it had in *Bernard*, that no new and material evidence to reopen the veteran's claims had been presented. R. at 553–54. In requesting reconsideration of the Board's decision, the veteran, through counsel, argued that the evidence submitted was new and material and raised the argument, and offered evidence in support of it, that rheumatic heart disease and rheumatic arthritis were residuals of rheumatic fever. R. at 556–58. Then, in accordance with 38 C.F.R. § 20.1001(c)(2) (1992), after the Board had granted his motion for reconsideration, the appellant's representative submitted a memorandum of authorities that included a reference to the Rheumatoid Factors article. R. at 598–605.

Subsequently, the Board obtained the IMO, and, pursuant to 38 C.F.R. § 20.903 (1993), allowed the veteran 60 days to respond. In response, the veteran submitted additional evidence in the form of Dr. Coleman's medical opinion. Thereafter, the Board, without remanding for the RO to decide the matter or to issue an SSOC, issued the September 1994 reconsideration decision that is presently on appeal. In that BVA reconsideration decision, the Board found that new and material evidence had been presented on both claims and proceeded to deny them on the merits.

The RO in August 1991 had initially not addressed the issues whether the veteran's heart disease and arthritis were residuals of rheumatic fever, and it did not address those issues after further evidence had been submitted and further factual development had occurred—submission of the Rheumatoid Factors article, Dr. Shaw's letter, Dr. Meehan's IMO, and Dr. Coleman's report. The RO's October 1991 SOC had addressed only the question whether, as of that time, he had submitted new and material evidence to reopen his previously and finally disallowed claims for service connection for rheumatic heart disease and rheumatoid arthritis with spondylitis. R. at 518.

Although the veteran may have argued the merits of his claim before the Board, reviewed the IMO, submitted additional evidence in rebuttal, and stated that he had nothing further to present, the Board was nevertheless required under *Bernard*, after finding that new and material evidence had been submitted, to ask the veteran if he objected to Board adjudication in the first instance. *Bernard, supra.* Alternatively, failing to make that inquiry of the veteran, the BVA decision should, under *Bernard*, have explained, as part of its statement of reasons or bases, why there was no prejudice to the veteran from its adjudication of the claim on the merits without first remanding the matter to the RO. This was required not only because the RO had not adjudicated the merits, as the RO had not in *Bernard*, but also because (1) additional evidence had been received by the Board and (2) additional factual development was required, and later obtained, to assess the validity of the veteran's new assertion regarding rheumatic fever.

Moreover, the VA General Counsel has previously identified in a precedent opinion the following inquiry that the Board must conduct when addressing questions not addressed by the agency of original jurisdiction (AOJ) in the decision being appealed: "[I]f the appellant has raised an argument or asserted the applicability of a law or [Court] analysis, it is unlikely that the appellant could be prejudiced if the Board proceeds to decision on the matter raised. *An exception would exist when additional factual development is required to assess the validity of the appellant's assertion.*" VA O.G.C. Prec. 16–92, at 7–9 (emphasis added) (quoted with approval in *Bernard*, 4 Vet.App. at 393–94). The Board is bound by VA General Counsel precedent opinions pursuant to 38 U.S.C. § 7104(c) and 38 C.F.R. § 19.5 (1995). In this case, where the Board decided a question that was not decided by the AOJ and

undertook "additional factual development", the Board was required to apply O.G.C. 16–92, especially since that opinion had been quoted with approval in *Bernard. See Bernard,* 4 Vet.App. at 393–94. The ROA does not indicate that the veteran here expressly waived these fair-process rights.

Under such circumstances, where the Board did not address the prejudice issue, the Court in *Bernard* concluded that it would not adjudicate that issue in the first instance and remanded that matter to the Board. *Bernard,* 4 Vet.App. at 394. Accordingly, under *Bernard,* it would be appropriate here to remand for the Board to consider and discuss, in the context of O.G.C. 16–92, whether the veteran had been given adequate notice of the need to present argument and further evidence on the merits of his claims and an adequate opportunity to appear at a hearing. If the Board were to conclude that the veteran had not been given adequate notice or opportunity, as discussed above, or that there were omissions from (or deficiencies in) the SOC (which would seem inevitable because the RO had addressed only whether there was no new and material evidence to reopen, not the merits of the claim), then it would be required under *Bernard* to discuss whether the claimant had been prejudiced thereby.

**3. Appellate Processing after Submission of Additional Evidence.** Rather than remand the matter for the Board to determine under *Bernard* whether the appellant was prejudiced by the Board's action, the Court could take the unusual step of adjudicating the prejudice issue in the first instance, as the Court did in *Curry v. Brown,* 7 Vet.App. 59, 66–67 (1994). In *Curry,* the Court also announced prospectively a new approach derived from *Bernard* and "the fair-process and notice concerns that [had] animated this Court's holdings in … *Austin* … [and] *Thurber,* [both *supra* ].…" *Curry,* 7 Vet.App. at 67. The *Curry* procedure is for the Board, in decisions issued after *Curry* was decided (October 5, 1994), to proceed as follows: "[B]efore undertaking a merits adjudication without first remanding the matter to the RO [where the RO had not addressed the merits of the claim], [the

Board is] to ask if the claimant objects to such Board adjudication in the first instance, and, if so, to specify how such BVA adjudication would be prejudicial to his or her interests." *Ibid.* This procedure was intended to "ensure that the Board decision avoids the error cautioned against in *Bernard, supra.*" *Ibid.*

When the Court announced its prospective procedure in *Curry,* not expressly applicable to this case under *Curry* because the BVA decision here on appeal was decided three weeks before the *Curry* opinion was issued, the Court did not discuss the impact of another VA fair-process regulation, specifically, 38 C.F.R. § 20.1304(c), relating to a VA claimant's right to have certain additional evidence he or she submits to the Board first considered by an RO. Section 20.1304 provides in pertinent part:

(a) *Request for a change in representation, request for a personal hearing, or submission of additional evidence within 90 days following notification of certification and transfer of records.* An appellant and his or her representative, if any, will be granted a period of 90 days following the mailing of notice to them that an appeal has been certified to the Board for appellate review and that the appellate record has been transferred to the Board, or until the date the appellate decision is promulgated by the Board … whichever comes first, during which they may submit a request for a personal hearing, additional evidence, or a request for a change in representation…. Any evidence which is submitted at a hearing on appeal which was requested during such period will be considered to have been received during such period, even though the hearing may be held following the expiration of the period. Any pertinent evidence submitted by the appellant or representative is subject to the requirements of paragraph (c) of this section and, if a simultaneously contested claim is involved, the requirements of paragraph (d) of this section.

(b) *Subsequent request for a change in representation, request for a personal hearing, or submission of additional evidence.* Following the expiration of the

period described in paragraph (a) of this section, the Board ... will not accept a request for a change in representation, a request for a personal hearing, or additional evidence except when the appellant demonstrates on motion that there was good cause for the delay....

. . . .

(c) *Consideration of additional evidence by agency of original jurisdiction.* Any pertinent evidence submitted by the appellant or representative which is accepted by the Board under the provisions of this section ... must be referred to the agency of original jurisdiction for review and preparation of [an SSOC] unless this procedural right is waived by the appellant or unless the Board determines that the benefit, or benefits, to which the evidence relates may be allowed on appeal without such referral. Such waiver must be in writing or, if a hearing on appeal is conducted, formally entered on the record orally at the time of the hearing.

38 C.F.R. § 20.1304(a), (b), (c) (1995).

█ The procedural protections provided to Board appellants in § 20.1304 are highly relevant to the issues before the Court in the instant case. Under § 20.1304(a), an appellant and his or her representative are allowed 90 days "following the mailing of notice [by the RO] ... that an appeal has been certified to the Board for appellate review ... during which they may submit a request for a personal hearing, [or submit] additional evidence". 38 C.F.R. § 20.1304(a). That regulation goes on to provide: "Any pertinent evidence submitted by the appellant or representative is subject to the requirements of paragraph (c) of this section...." *Ibid.; see also* 38 C.F.R. § 19.31 (1995) (requiring SSOC to be furnished to an appellant "when additional pertinent evidence is received after [an SOC] ... has been issued"). (The ROA does not indicate that an SSOC was ever issued to the veteran here.) By its express terms, § 20.1304(a) does not make § 20.1304(c) applicable to a situation where more than 90 days have elapsed following the RO's mailing of notice that an appeal has been certified and the record transferred to the Board unless that evidence is submitted

at a BVA hearing. The regulation provides that during the post-certification and post-transfer 90-day period, unless the Board decides the case earlier or at a BVA hearing regardless of when it is held, 38 C.F.R. § 20.1304(a), the claimant may submit additional evidence to the Board as of right; thereafter, such additional evidence may be submitted only for "good cause", 38 C.F.R. § 20.1304(b).

In the instant case, the RO certified the appeal sometime between December 1991 and August 1992 because, although the ROA does not contain an RO certification of the appeal to the Board, the veteran's VA Form 1-9 was filed in December 1991 (R. at 529) and the Board issued its decision in August 1992 (R. at 547). Dr. Coleman's May 1994 report was therefore submitted more than 90 days after the RO certified the appeal to the BVA and was not presented at a hearing, and no express showing of "good cause" was made for its introduction. Thus, the § 20.1304(c) requirement of return to the RO for consideration of that evidence, unless expressly waived in writing by the claimant, does not appear to apply based on the face of the regulation.

█ *4. Austin and September 1994 BVA Chairman's Memorandum.* However, the Court in *Austin* noted that BVA Chairman Memorandum No. 01-93-12, dated May 28, 1993, "incorporated the requirements of 38 C.F.R. § 20.1304 into the 'processing of appeals affected by Thurber'". *Austin,* 6 Vet.App. at 551. The Court also noted:

[I]f the BVA were to impose, when it intended to rely on its own medical advisor's opinion, the requirement of a showing of "good cause" by appellant under § 20.1304(b) as a precondition to submitting additional evidence to the BVA after the mailing of notice to them that the appeal has been certified and the record transferred to the Board, as discussed *supra,* such imposition would also violate *Thurber.* Appellant's right to submit evidence under *Thurber* is not premised upon a preliminary showing of 'good cause'. In so noting, we are not suggesting, however, that a reasonable period during which an appellant may submit evidence or other-

wise respond cannot be established consistent with *Thurber*. . . .

*Austin*, 6 Vet.App. at 551. This statement by the Court that a "good cause" requirement could not be imposed on a claimant's right under *Thurber* to submit evidence in rebuttal to an IMO has become a precedential holding of the Court in *Daniels v. Brown*, 9 Vet.App. 348, 352–53 (1996), where the Court remanded to the BVA because it had conditioned the claimant's right to submit rebuttal evidence on a showing of "good cause". Hence, although this Court has not expressly invalidated § 20.1304 because of its express "good cause" requirement as applied to a *Thurber*-type situation, it has clearly held that the application of the "good cause" requirement in § 20.1304(a), (b), to a *Thurber* situation violates the fair-process principles underlying *Thurber* and *Austin.*

After the issuance of *Austin* in July 1994, the BVA Chairman issued a Memorandum in September 1994 "to consolidate into one document all of the [Board] instructional material that has been issued regarding compliance with *Thurber v. Brown*, 5 Vet.App. 119 (1993)". BVA Chairman's Memorandum No. 01–94–19, "Processing of Appeals Affected by *Thurber v. Brown*, 5 Vet.App. 119 (1993)" [hereinafter September 1994 BVA Memorandum] at ¶ 2.a. (Sept. 8, 1994). The September 1994 BVA Memorandum stated: "[T]he purpose of the procedures set forth [in this Memorandum] is to assist the Board in complying with the holdings of [the Court] in *Thurber* and related cases. . . ." *Id.* at ¶ 2.b; *see* 38 C.F.R. § 20.2 (1995) (in the absence of specific rule or procedure, BVA Chairman may prescribe procedure consistent with provisions of title 38, U.S.Code, and BVA rules of practice).

The September 1994 BVA Memorandum adopted the § 20.1304(c) procedure for return of the case to the RO, unless waived by the appellant in writing, when the Board, as it did here, accepted the appellant's evidence in rebuttal to a Board-procured IMO. September 1994 BVA Memorandum at ¶ 11.d. The Memorandum, which was in effect at the time of the Board's September 12, 1994, decision in this case, requires the following procedure:

d. **Waiver of AOJ Review.** Any pertinent evidence submitted by the appellant or representative which is accepted by the Board under § 20.1304 must be referred to the AOJ for review and preparation of an SSOC unless this procedural right is waived by the appellant or unless the Board determines that the benefit or benefits to which the evidence relates may be allowed on appeal without referral. Such waiver must be in writing or, if a hearing on appeal is conducted, formally entered on the record orally at the time of the hearing. [38 C.F.R.] § 1304(c).

*Ibid.* In this case, the appellant submitted rebuttal evidence—Dr. Coleman's May 1994 report—that the Board accepted. Hence, the Board has by rule adopted a procedure, which was not followed in this case, where after the Board proposes reliance upon *Thurber* evidence and the appellant submits evidence in response, the case will be returned to the RO for adjudication unless the Board receives a written "waiver of consideration by the agency of original jurisdiction". "Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures." *Fugere v. Derwinski*, 1 Vet.App. 103, 108 (1990) (quoting *Morton v. Ruiz*, 415 U.S. 199, 232, 94 S.Ct. 1055, 1073, 39 L.Ed.2d 270 (1974)); *see Vitarelli v. Seaton*, 359 U.S. 535, 538, 539–40, 79 S.Ct. 968, 971–72, 972–73, 3 L.Ed.2d 1012 (1959); *Service v. Dulles*, 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267–68, 74 S.Ct. 499, 503–04, 98 L.Ed. 681 (1954); *Austin*, 6 Vet.App. at 552 (quoting *Fugere* and *Morton* and citing *Vitarelli* and *Accardi* ). Accordingly, a remand is in order for this procedure to be followed by the Board in the instant case.

Specifically, the Board decision will be vacated and the matter remanded to the Board for it to proceed as follows pursuant to the September 1994 BVA Memorandum and 38 C.F.R. § 20.1304(c), as well as this Court's precedential opinions in *Daniels* and *Austin:* Advise the appellant that the case will be returned to the RO for readjudication and issuance of an SSOC unless the Board receives, within whatever reasonable period of

time the Board specifies, a written waiver by the appellant of these procedural rights. As a consequence, the Court need not consider the remedy for the *Bernard/Curry* violation, discussed in part II.B.2 and part II.B.3., above.

The Court notes that the September 1994 BVA Memorandum states:

Following the expiration of the 90–day period, the Board will not accept additional evidence except when the appellant demonstrates on written motion that there was good cause for the delay. 38 C.F.R. § 20.1304(b). When an appellant submits additional evidence in response to a *Thurber* notice and list of evidence, the evidence will be deemed to be a motion that good cause exists for the delay. The Board Member to which the case has been assigned will rule on the motion in accordance with § 20.1304(b)(1) and (2).

September 1994 BVA Memorandum at ¶ 11.c. The Board thus continues to apply a "good cause" requirement on a claimant's submission of *Thurber* rebuttal evidence when it is presented more than 90 days after the appeal is certified to the Board and the appellate record is transferred there and that evidence is not presented at a BVA hearing. However, this "good cause" aspect of the procedure adopted by the September 1994 BVA Memorandum is clearly at odds with *Daniels* and *Austin.*

**5. Need for New Approach.** The Court believes that the above discussion and this case illustrate the need for the Board, under 38 C.F.R. § 20.2, to coalesce the fair-process approaches and holdings of *Bernard, Thurber,* and *Austin* into a single, simplified, and generally applicable BVA-adjudication procedure. The Court is unable to divine a conceptual distinction between the Board's adjudication of an *issue* not considered by the RO (*Bernard/Curry*) and of a claim based on *evidence* not considered by the RO (*Thurber/Austin*). In fact, in this case we have both situations: The Board considered evidence (the Rheumatoid Factors article, Dr. Shaw's letter, Dr. Meehan's IMO, and Dr. Coleman's medical report) as to an issue (whether the veteran's heart disease and arthritis were residuals of rheumatic fever).

Neither the evidence nor the issue was considered by the RO. Further, in terms of the claimant's procedural rights, no distinction is apparent between a situation where *the claimant* initiates the consideration of new evidence by submitting that evidence, the situation that § 20.1304 addresses, and the situation where *the Board* itself introduces the new evidence, the situation addressed by *Thurber* (IMO) and *Austin* (Board medical adviser opinion). Finally, a new approach could obviate the need for the complicated procedural adjudication step of deciding whether the Board's adjudication in the first instance of an issue not decided by the RO would prejudice a claimant's interests. *See Bernard* and *Curry,* both *supra.*

Such a unified approach, coalescing the approaches and holdings of *Thurber, Austin, Bernard,* and *Curry,* all *supra,* for purposes of future BVA decisions could provide as follows: Whenever relevant evidence comes before the BVA, or the BVA seeks to consider any part or all of an issue, that was not considered by the RO in the decision on appeal to the Board, the BVA would (1) advise the claimant of its intent to consider such evidence (and of its intended reliance on it possibly to deny the claim) or issue; (2) advise the claimant that such consideration, in the first instance, could result in the disallowance of the claim and the claimant's forgoing of certain procedural rights to an RO decision, an SSOC, and an RO hearing, *see* 38 C.F.R. §§ 19.31, 3.103(c), and that therefore a waiver, pursuant to § 20.1304(c), of such procedural rights is required in order for the Board to consider the new evidence or issue without prior RO consideration; and (3) advise the claimant, consistent with the September 1994 BVA Memorandum, that unless the claimant submits to the Board the waiver, within a reasonable, stated period of time, the case will be returned to the RO for initial adjudication as to the evidence or issue not yet considered. *See Austin,* 6 Vet.App. at 551 (Secretary free to establish "reasonable period during which the appellant may submit evidence or otherwise respond"); *Thurber* and *Bernard,* both *supra;* 38 C.F.R. § 20.1304(c); *see also Daniels,* 9 Vet.App. at 353 (Court remands for *Austin/Thurber* er-

ror because "Court cannot say that the BVA's error was not prejudicial" where "it is possible that the appellant would have sought and obtained additional medical opinions, evidence, or treatises to rebut the Board's evidence"). Although the Court is not mandating the adoption of such a procedure at this time, such an action by the Board, or the Secretary, would obviate the need for the Court to consider whether a procedure of this sort is required in order to effectuate more fully the fair-process principles underlying *Thurber, Austin, Bernard,* and *Curry.*

■ *6. Further Development and Readjudication.* In addition, on remand, the Board must ensure that an attempt is made to obtain a March 1943 hospitalization record from the Milwaukee General Hospital (*see* R. at 485) and the medical reports referred to by the BVA as having identified "the onset of an infectious illness in the spring of 1943" (R. at 28). *See* 38 U.S.C. § 5107(a) (Secretary has duty to assist claimant in developing facts pertinent to claim); *Masors,* 2 Vet.App. at 186–87 (duty to assist may, in an appropriate case, include the duty to seek to obtain pertinent private medical records); *Littke v. Derwinski,* 1 Vet.App. 90, 91–92 (1990). Also, if the Board or the RO wishes to utilize an IMO, it must be obtained by a process that presents the question(s) in a neutral and objective manner, expressing only those facts that are relevant to the question(s) posed. *See Bielby v. Brown,* 7 Vet.App. 260, 268–69 (1994) (IMO engagement letter must pose hypothetical question to expert in manner that does "not suggest an answer or limit the field of inquiry by the expert"); *Austin,* 6 Vet.App. at 552 (Board process for developing additional medical evidence must "ensure impartiality", not be aimed at "support[ing] a predetermined outcome" (citing cases)). Any such request for an IMO should focus on the relationship of the veteran's rheumatic heart disease to rheumatic fever and the symptoms experienced by the veteran during and after service.

The Court also notes that in his February 1988 statement to VA, the veteran recounted that his VA treating physician, Dr. Limber, had stated "that the heart condition for which [the veteran is] presently being treat-

ed is a long-standing problem which may be directly connected to some medications [he] had [been] administered while on active duty and the residuals of a serious fall [he] suffered (also while on active duty)." R. at 349. Although the ROA contained Spokane VAMC medical records from Dr. Limber showing that the veteran had been hospitalized for approximately four days in January 1988 for treatment of "mitral stenosis, echo evidence of mitral valve", and "articular flutter, slow ventricular response" (R. at 353), there is no indication in the ROA that VA informed the veteran that he should submit a direct statement from the physician himself to the effect that there may be a causal link between the medication the veteran received in service and his present heart condition. *See* 38 U.S.C. § 5103(a); *Robinette v. Brown,* 8 Vet.App. 69, 79–80 (1995) (holding that nature and extent of section 5103(a) duty depends on evidence that had been submitted in support of particular claim and evidence of which VA had notice). Because VA was on notice that such evidence might provide a causal connection between the appellant's heart condition and the medication he received in service, we conclude that the Secretary had a section 5103(a) duty to notify the appellant regarding the procurement and submission of any such additional evidence. *See Graves v. Brown,* 8 Vet.App. 522, 524–25 (1996) (applying section 5103(a) and *Robinette* to claim to reopen).

In readjudicating the case on remand, the Board must provide a full statement of its reasons or bases under 38 U.S.C. § 7104(d)(1), *see Gilbert,* 1 Vet.App. at 56–57, and, in light of the "significant" evidence in support of the claim, must explain its consideration of the benefit-of-the doubt rule under 38 U.S.C. § 5107(b), *Williams (Willie) v. Brown,* 4 Vet.App. 270, 273–74 (1993). Finally, the Board should clarify whether the veteran still wishes a hearing before the Board in view of his request for a hearing in his December 1991 VA Form 1–9. *See* R. at 529.

### III. Conclusion

Upon consideration of the record and the submissions of the parties, the Court vacates the September 12, 1994, BVA decision and remands the matter of service connection for

rheumatic heart disease for expeditious further development, proceedings, and readjudication, on the basis of all applicable law, regulation, and procedure, and issuance of a readjudicated decision supported by an adequate statement of reasons or bases, *see* 38 U.S.C. §§ 5103(a), 5107(a), (b), 7104(a), (d)(1), 7261; 38 C.F.R. § 20.1304(c); the September 1994 BVA Memorandum; *Fletcher v. Derwinski*, 1 Vet.App. 394, 397 (1991)—all consistent with this opinion and in accordance with section 302 of the Veterans' Benefits Improvements Act, Pub.L. No. 103–446, § 302, 108 Stat. 4645, 4658 (1994) (found at 38 U.S.C. § 5101 note) (requiring Secretary to provide for "expeditious treatment" for claims remanded by BVA or Court). *See Allday v. Brown*, 7 Vet.App. 517, 533–34 (1995). "On remand, the appellant will be free to submit additional evidence and argument" on the remanded claims. *Quarles v. Derwinski*, 3 Vet.App. 129, 141 (1992). A final decision by the Board following the remand herein ordered will constitute a new decision which, if adverse, may be appealed to this Court only upon the filing of a new Notice of Appeal with the Court not later than 120 days after the date on which notice of the new Board final decision is mailed to the appellant.

VACATED and REMANDED.